| 2 | 126 |
| 102 | 194 |

| 2 | 126 |
| 52a | 490 |

BEAN, ODEN AND RECTOR *v.* VALLE, JANIS AND VALLE.

1. Depositions filed but not preserved on the record, in a Chancery cause, cannot be used before the Supreme Court, on the trial of an appeal from the decree of the Circuit Court.

2. A plea of the statute of frauds, should expressly aver, that the contract concerning the land, was not in writing—and should contain an answer to all the other facts not expressly denied by it.

3. Where B. endorses a receiver's receipt "transferred" and signs the same and delivers it to K. with verbal instructions to deliver said receipt to a third person, upon the payment of a certain sum of money—it is not necesssary for K. to do any act in writing; there is no act in writing left for him to do. The payment of the money and delivery of the certificate, constitute a valid agreement.

4. A specific performance of a contract will not be decreed, where it appears in evidence that the vendee had knowledge of a valuable mine upon it, and concealed the fact from the vendor.

5. Mere inadequacy of price, unless so great as to amount to evidence of fraud, is no ground for refusing a specific performance.

6. Payment of the purchase money, is not such a part performance of a contract for the sale of lands, as to take it out of the statute of frauds; nor is a mere taking possession of the lands, without the consent of the vendor, and without a declaration of the intention with which possession was given, such part performance.

7. Under the statute of frauds and perjuries, it is not necessary that the consideration of the agreement be in writing.

IN CHANCERY, appeal from the Circuit Court of Jefferson county.

M'GIRK, C. J., delivered the opinion of the Court.

Vallee, Janis & Valle, brought their bill for a specific performance of a contract, for the sale of a tract of land, against the defendants.

(127) The Court made a decree for the plaintiffs, Valle, Janis & Valle. Bean, Oden and Rector appealed to this Court. The error assigned is a general one, which is, that the decree is erroneous; under this assignment, we will only look at the decree, the bill, answer and exhibits. Before I proceed with the case, I will advert to one point made by the appellants, which came up as matter of practice, which is, that it appears by the record that the cause was submitted to the Circuit Court on the bill, answers, &c., and also on depositions filed. Certain depositions are now produced, and the appellants' counsel insists on the right to use them before this Court, as a part of the facts on which the decree is founded, or should have been founded; it is certified on these depositions that they were filed in the Circuit Court. It is objected that the depositions cannot now be used, because they are not preserved on the record as directed by the 42d section of the act to regulate proceedings in Chancery, (*Digest*, 645.) I am clearly of opinion the appellees are right in their objection. The 42d section of the act says, "it shall be the duty of every Court of Chancery (from whose decree an appeal lies) to cause the facts on which they found

Bean, &c., *v.* Valle, &c.

their decree, fully to appear upon the records, either from the pleadings and decree itself, or from a state of the case agreed by the parties or their counsel, or from an examination of witness reduced to writing by the commissioner, or by a special ver- dict found by a jury empannelled for that purpose.

By the 28th section of the same act, the Court is required to appoint a commis- sioner, whose duty it shall be, says the section, to take testimony in any cause when required thereunto by the Court, and to report thereon, &c.

The 46th section of the same act says, "that in all appeals from a Court of Chan- cery, the Supreme Court shall examine the record, and take into consideration such facts *only* as appear by said record to be the facts upon which the sentence or decree appealed from was founded," &c.

These depositions appear to have been taken, not by the commissioner, but by a Justice of the Peace, and unless the facts appear upon the record by one of the four modes required by the 42d section, it is most clear to me they cannot be taken any notice of on an appeal.

I will now proceed to the facts contained in the pleadings of the parties, and those contained in the decree. It appears that on the third of July, 1824, one of the de- fendants, J. L. Bean, obtained from the receiver of public money, for the St. Louis (123) land district, the following receipt, (to-wit:)

"Receiver's Office, St. Louis, 3d July, 1824.

Received from Jonathan L. Bean, of St Louis city, Mo., the sum of one hun- dred dollars, being in full for W. half S. W. qr. of section No. 4, township No. 38, N. range No. 5 E. containing eighty acres, at the rate of $1 25 per acre, signed G. F. Strother, Receiver."

That immediately Bean, with others under his direction, entered on the land and dug for lead ore; that some lead was raised therefrom, but the prospect was not very good. That in the meantime Bean offered to sell the land to one Duncan for $100; that this operation continued till about the month of November in the same year, when Bean left the land and went to St. Louis, and appointed an agent to attend to the land. That before he went to St. Louis, he proposed to sell the land to the com- plainants, and that no agreement was then made; that mining was still carried on under the agent without much success. That sometime in the month of November in the same year, Bean wrote and delivered to one Keemle the following letter:

"Mr. A. Janis, Sir:—Since my arrival at this place, several applications have been made to me for the half quarter section of land adjoining your furnace, but owing to my having made a previous arrangement with you, I felt myself in honor bound to give you the preference. Mr. Keemle, who is on a visit to your mines, will therefore make the arrangement with you the same as if I were present. Esteem, yours, &c.

J. L. BEAN."

"If Mr. Janis is not present, Mr. Valle will please read the above.     BEAN."

Which letter was written at St. Louis, and addressed on the outside to Valle, Janis & Valle, and together with the receipt of the Receiver above mentioned, delivered to one Charles Keemle, for the purpose of enabling him to dispose of the land to com- plainants, who then were, and for some time before had been, doing business under the name, firm and style of Valle, Janis & Valle. That at the time Bean delivered the letter and receipt to Keemle, he gave to him verbal directions to dispose of the land, and get therefor, if he could, $125, and if not, then to take $100; he also gave

Rean, &c., *v.* Valle, &c.

to Keemle at the same time, a letter to Garraty, his agent, the contents of which were not proved.

That a few days thereafter Keemle gave the letter to Janis, one of the complainants, and proposed to sell the land to him for $125, which Janis refused to give, (129) stating that the land was of no value to him but for the wood on it, and of its contiguity to his own land, and that because the diggers on it were troublesome to him, he would buy it, and that he would not give more for it than the original price.

That Keemle endeavored to get more for the land, but being unable to do so, agreed to take $100, and delivered to said Janis the receipt of the Receiver, with the following endorsement thereon : " Transferred to Valle, Janis & Valle," and signed " J. L. Bean," which signature was admitted and proved to be in the hand writing of Bean, and the body of the transfer was alledged by the bill, and not denied by the answer, to be in the hand writing of Bean.

It was expressly admitted by the respondents' counsel to be so, by an admission signed by them of record.

It was also proved that Bean was fully paid the $100 for the land ; and that Bean, when informed of the sale by Keemle, expressed himself well satisfied.    It appears also that Bean afterwards sold the land to Oden, for what consideration does not appear, and that Oden soon thereafter so'd one half thereof to Rector, for what consideration does not appear ; and that both Oden and Rector, when they bought, knew of the sale to the complainants ; and it also appears that immediately after the purchase by the complainants, they went into possession and went to mining, and soon discovered a valuable lead mine.    Rector's answer denies fraud and combination, and insists on the statute of fraud, and also on the registry act ; insists on inadequacy of price, and fraud and suppression of truth by complainants.    Bean's answer insists on fraud in complainants in suppressing the truth, inadequacy of price, &c.

After Bean and Rector had answered, they moved for leave to file the pleas of the statute of frauds, which leave was refused.

This is not assigned for error, nor a point made in argument.    I suppose whatever point might have been made on this matter is abandoned.    At all events the pleas were clearly bad, for the same reason that I will hereafter show Oden's plea is bad ; they are the same as Oden's in substance and form.

The Court ought to require, when its discretion is applied to, that the plea or amendment should be issuable in fact, which these pleas were not.    They should also have been sworn to : *Cooper's Equity Pleading*, 231.    Replications were put into the answers of Bean and Rector, and then the cause as to them was set for hearing. Oden filed a plea of the statute of frauds, which was demurred to, and the demurrer (130) sustained ; he had leave to file an answer on terms, and having failed to do so, the bill was taken *pro confesso*, and set for hearing as to him also.

The matter of this demurrer was not agreed at the bar,  nor is it all mentioned in the points made by the appellants' counsel.    I will, however, as it fairly comes up, bestow some attention on it.    This plea contains no averment that the contract was not in writing, &c.

It should expressly aver that the contract was not in writing.    *Cooper's Equity Pleading*, 256, 225 seq.

This plea should also contain an answer to all the other parts not expressly denied by it.

Bean, &c., v. Valle, &c.

It is true these reasons are not within the scope of those assigned by the demurrer, if I understand them rightly, but as the opinion of the Court is for the right party, that opinion must stand.

As to the residue of this case, the appellants' counsel have made and relied on the following points:

First. That taking all the testimony together, Keemle, as agent, executed no writing whatever.

Second. That the endorsement on the back of the Receiver's certificate, does not show what land is transferred, nor how much, nor for how much.

The third point of the defence against the decree is, that the complainants were guilty of unfairness, *suspressio veri* and *suggestio falsi.*

Fourth. That the price is greatly inadequate.

Fifth. That the statute of fraud covers the case, and therefore no specific performance can be decreed.

I will examine these points in the order in which I have stated them.

First, that Keemle did nothing in the name of Bean in writing. I admit that Keemle did no act in writing. The evidence is, and the admission is, that Bean wrote on the back of the Receiver's receipt transferred, and signed his name thereto, with the express intent that Keemle might deliver the receipt to complainants, if they would give for the land one hundred dollars. No act in writing was left for Keemle to perform; what he had to do could not be done in writing, to wit: simply to deliver the paper when he was satisfied as to the one hundred dollars. If this transfer has any effect at all, (which I will consider hereafter,) it was delivered to Keemle like an *escrow*, the delivery of which is always in *pais*. If this had been a deed duly drawn and signed, and sent to be be delivered by an agent to a particular person, provided he would pay before hand a certain sum of money, and on presentation (131) such person should pay the money—surely the delivery would be good, and the transaction good to pass the estate: so that there seems to me to be no difficulty as to this point, and the question as to agency presents no difficulty.

The second point to be considered is, whether there is sufficient connection between the receipt of the receiver, and the transfer on the back thereof to show what land or thing was transferred, and how much land, if any, and for what sum.

This transfer being on the back of the receipt does most satisfactorily satisfy my mind that it is the identical land mentioned in the receipt that is transferred. If the transfer had been on a separate piece of paper, without any other description than it has, then it would not be capable of itself to show what was transferred, but when a note, bond, or any other instrument, has the words "tranferred to A" endorsed thereon, no one can reasonably be at a loss to know to what thing these words apply.

The remaining branch of this objection is of grave import, and presents to my mind much difficulty, which is, whether the transfer should not show the consideration, which this does not show. No doubt if it were not for the Statute of Frauds, the consideration could be shown by parol testimony. I will defer the further consideration of this branch of the objection, till I come to consider the case under the objection which relates to the Statute of Frauds.

The third point is, that a specific performance ought not to be decreed, because the complainants suppressed their knowledge of a valuable lead mine, being contained in the land. Many authorities are cited to sustain this point. I admit that if

these things had been proved, the authorities would apply to a case that might arise, but which has not arisen in this case, and a solid objection might thus be formed against a specific execution of an agreement. The only evidence I can discover, looking that way, is that immediately after the sale to complainants, they took possession of the land and went to work thereon, and soon discovered a valuable lead mine.

That it was contiguous to their land and lead furnace; the circumstance of their contiguity might indeed enable them the more easily to discover the secret value of Bean's land, but it does not prove they did do so, though connected with the fact that they made a discovery soon after they began mining thereon. This discovery might well have been made without the least particular knowledge of any cer- (132) tain body of lead mineral being contained in the land. Whoever is at all acquainted with the operation of mining, must know that a man may live on land for half a century, may dig into it often and deep and discover nothing of value; another may thereafter, or he may himself thereafter, by one day's labor, discover a mine of great value. All the mining that was done on this land, before the complainants got it, was under the eye and inspection of Bean, from July till November, and then for a short time under the inspection of his agent; and the evidence is, that for all this time, even till the time of the complainants' purchase, nothing presenting the prospect of much profit had come to light; there is no evidence that the complainants were ever on the land, or had any communication with the agent or diggers belonging to Bean. This point appears to me to be wholly groundless.

The next point is, that the price was inadequate, the bargain a hard one, and that Chancery will not decree a specific performance where this is the case. This is true to a certain extent, but not true to the extent it must go to avail the appellants any thing in this case. The authorities cited to support this position are, Mostloch v. Buller, 10 *Vesey*. 29'; *Sugden*, 170. I have not got 10 Vesey. I find in Sugden, under this head, a reference to this authority, but Sugden cites it expressly to show that mere inadequacy of price is not a sufficient ground to refuse a specific performance, (second American edition from fifth London, 189,) In this same edition, 189, which I suppose is the authority referred to by the counsel above, Sugden says, "that a Court of Equity cannot refuse to assist a vendor merely on account of the price being unreasonable, and a specific performance will certainly be enforced if the price was reasonable at the time of the contract made, however disproportionable it may become afterwards. If, however, a man be induced to give a. unreasonable price for an estate, through the fraud or misrepresentation of the vendor, or by an industrious concealment of the defects in the estate, equity will not compel a performance.

The appellants to this point cite Pow. on Con's. 28, 152, to 59, and 200, 201 In this first citation, I find the doctrine laid down by Powell, "that inadequacy of price abstracted from all considerations, seems of itself (upon revision of the best authorities) to furnish no ground upon which a Court of Equity will set aside, or rather relieve a party to a contract; the law of England never having fixed any proportion (133) that the price should bear to the thing purchased. But if the cause of inequality of price be founded in circumstances from whence a Court of Equity may conclude that the consent to accept such was not free, or was conditional, being had under an impression that circumstances were otherwise than they were represented to the party accepting such unequal terms, in such case, if the party contracted with

be acquainted and take advantage thereof, it will furnish ground for a Court of Equity to set such contract aside;" and I should suppose much more' to refuse its aid.

It seems also if the seller be in want of money, and the buyer knew this, and helped to enthrall him, equity will not help the buyer: same book, 156.

In the same book, 200 a 201, Mr. Powell says that "an agreement for the sale of an estate, which from the nature of it, when compared with the circumstances of either of the parties to it, furnishes decisive evidence of his being surprised, will be set aside in equity, although there be no surprise, fraud, or circumvention actually proved, and though a conveyance had been made pursuant thereto." The case of Wharwood *v.* Simpson, 2 *Vernon*, 183, is cited to support this position. The position taken by *Powell* is a strong one, and I have no doubt is supported by the case cited by him: but I doubt if the case cited by *Powell* is sound, either in principle or law; but suppose it to be correct, I cannot see that it is like the present case, according to the report given of it by *Mr. Powell.* It was a case where a steward had for many years been employed in the management of an estate; he articled with a person employed by the owner to become the purchaser at £15,000, and by the articles it was agreed, that he should either pay the whole money, or might return land to make up what he paid short in money of the £15,000, and he obtained a conveyance of a part at an under value, alledging that it was not material what sum was mentioned to be the consideration, and he had sold other parcels and paid money to the amount of £1,500 as the vendor appointed, and he now offered to return so much of the land as would make up the £15,000.

The Court, on a bill brought for that purpose, set aside the articles and the conveyance made to the vendor, except as to what had been sold; declaring that they looked upon the vendee but as an agent for the vendor, and one in whom he had reposed great trust and confidence, which the vendee had deceitfully abused; and that the articles themselves seemed to manifest surprise, the vendor having occasion to sell to raise money, and yet the articles left the vendee at liberty to pay as small a (134) sum as he pleased, and return what of the land he pleased to make up the value. *Mr. Powell* adds, "that the Court assumed a greater latitude in this case, because the time fixed by the articles at which he was to pay or return the land, had elapsed." As to the ground which the Court took in this case, that this steward was to be considered the agent, and that he had abused his trust, the case does not show at all that the vendee was in any respect the agent for the sale of the land; and it does show that for that purpose there was another person employed, yet because he was agent for the management of the estate, they make him agent for the sale also. I admit that this, on the part of the vendor, was a foolish contract; but that *every bargain,* which is not a wise or saving one, should of itself and for that reason furnish manifest ground of surprise, I deny. If this be law, the trading business of the country would ultimately fall into the hands of Courts of Chancery.

But in the case at bar, there was no trust reposed in the appellees; there is no evidence they had any special secret means of knowing that Bean was about to be surprised. Bean had mined on the land from July till November with others under him, and in that time he did not find this valuable lead mine. Bean says he bought the land with a hope that it contained lead, and doubtless the appellees hoped so too when they bought of Bean; but that they knew of any thing particularly valuable, there is no evidence. We have seen from *Sugden,* 189, that the price must be inade-

quate at the time, and it must be grossly so. In the case Gwyne v. Heath, 1 *Br. Ch. ca.* 9, cited by *Bridgman's Index,* p. 57, *Law* is said to have observed that to set aside a conveyance, there must be an inadequacy so strong, gross, and manifest, that it must be impossible to state it to a man of common sense, without producing an exclamation at the inadequacy. *Lord Eldon* (in Trecothe and Coles, 9 *Vesey,* 246, *Bridg. Index,* 57) is reported to have said, inadequacy of price does not depend upon giving *pretium affectionis,* from any peculiar motive beyond what another man would think the reasonable price; but unless the inadequacy of price is such as shocks the conscience, and amounts in itself to conclusive evidence of the fraud in the transaction, it is not a ground sufficient for refusing a specific performance. Accidental subsequent advantage made of a bargain, is no evidence of inadequacy. From a view of these authorities, I can see no ground to refuse a specific performance. If any evidence existed to show that the complainants were in possession of important (135) facts, and that they concealed them from the other party, then inadequacy of price might raise a strong presumption of fraud.

The next and last point is, that this case is within the statute of frauds. Our statute of frauds is in terms as to this particular matter, a copy of the English statute of 29 *Chas.* II.

By way of obviating this objection to the decree, the complainants rely on a part performance:

First. The payment of the purchase money.

Secondly. Being let into possession. The evidence is clear enough that the purchase money was paid. Whether payment of the purchase money is to be considered part performance, the authorities are contradictory. *Sugden,* 87, the cases are brought together, and I think the better authority is, that payment of the purchase money is no part performance: see *Lord Redesdale's* opinion in the case of Winan v. Cook, *Scho & Lefroy,* 22, 40.

The next inquiry is, whether being let into possession is such a part performance as takes the case out of the statute. It seems to be agreed by the English Chancellors, that a delivery of possession by the vendor to the vendee, shall be considered a part performance and take the case out of the statute of frauds: *Sugden,* 84. I think, however, that question cannot be discussed now; I can find no evidence that there was any delivery of possession. The evidence on this point is, that immediately after the sale as aforesaid, the complainants entered upon the possession of the land, and thenceforth continued to possess and occupy the same as owners, with the knowledge of said Bean, until July; that they soon made a discovery of lead; and that after the knowledge of the discovery came to Bean, he recognized the sale and expressed himself well satisfied, &c. Here was no delivery of possession; but there was a taking possession. Now if it appeared that Bean lived near the spot, and saw the complainants occupy, and made no objection, I should take it to be strong evidence that they took possession by his leave. The fact that they took it, and exercised ownership over it, and that Bean knew it, does not in my opinion amount to a delivery of possession; for aught appearing on the record, Bean might, at the time they took possession, and afterwards while they kept it, have lived in a distant country. I understand the possession should be delivered, and the object and reason of the delivery should be clearly made out, to have been in pursuance of the agreement, without which a British Chancery Court would not take possession to be (136) part performance. Neither of these points being sufficient to take the case

out of the statute of frauds, I will proceed to investigate the remaining point, which is, whether the agreement is itself sufficient to take the case out of the statute. The words of the act of the General Assembly of the Territory of Missouri, (which was in force when this transaction came into being,) are, that "no action shall be brought whereby to charge any executor or administrator upon any special promise, to answer for any debt or damages out of his own estate, or whereby to charge the defendant upon any agreement made in consideration of marriage, or any contract for the sale of lands, tenements or hereditaments, or any interest in or concerning them, or any lease thereof, &c., unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged, &c."

There is no provision in our statute of frauds similar to that section in the British statute, which respects the sale of goods. I think this Territorial act must govern this case, as it was in force at the t me this transaction came into existence, though it was repealed in 1825. For whatever rights and liabilities the parties created or incurred, at the time of this transaction, those rights and liabilities still remain.

The statute says, "no action shall be brought on any contract for the sale of land." I do not so much consider this transaction a contract for the sale of land, as a contract whereby land is actually sold; it is, nevertheless, a case embraced by the statute; as it is a contract for an interest in land, I consider it an equitable sale, and equity raises a corresponding duty on the seller, to make the title good at law, unless the statute interposes to prevent it. I consider this transfer sufficiently certain as to the thing sold, and certain as to quantity of interest sold. It is not like the case in Sugden, much relied on by the appellants; that appears, in the text, to have been a case where an estate was sold for a certain number of years, purchased with a rent reserved, and the Court could not ascertain a portion of the rent; but Sugden himself cites by his reference a number of cases, *contra;* and note 1, at the bottom of the page, denies that the point as stated by Sugden, is to be found at all in the register. *Sugden* 65, 2d American edition.

But it is contended by the appellants' counsel, that this transfer or contract, should show the consideration as well as the thing to be done.

(137) There is much difficulty on this point. We will examine whether the consideration, cause or inducement to make an agreement or contract, is necessary to appear in writing or memorandum, to be signed by the party to be charged therewith.

On the one side it is contended that the consideration of the agreement must be in writing, as well as the thing to be done on the part of the seller of the land, and that in this case, the word "transferred" on the back of the receiver's receipt imports no consideration. In the identical clause in question, respecting a contract for the sale of land, I find no decision but on that part which says, no action shall be brought whereby to charge the defendant, upon any special promise, to answer for the debt, default or miscarriage of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, &c. There have been several decisions. The first on this subject took place in 1804, in the Court of King's Bench in England, and reported in 5 *East.*, p. 10, by the name of Wayne *v.* Walters; the case appears to be a case where one person undertook in writing, to pay the debt of another, in consideration of forbearance to sue.

On the trial, the plaintiff gave in evidence the following note—" Messrs. Wayne & Co.: I will engage to pay you by half past 4 this day, fifty-six pounds and expenses on bill, that amount on Hall ; signed, John Hall," dated, &c.

On this it was objected on the part of the defendant, that though the promise to pay the debt of another was in writing, yet as it did not express the consideration of the promise, the promise was void by the statute of frauds and perjuries.   The Court of K. B. decided that the consideration must be in writing, as well as the special promise to pay the debt of another.  5 *E.*, p. 10.

The next decision relating to this subject was made in the year 1805, by the same Court, 6 *E. R.* 307 ; Egerton v. Mathews.   This decision took place on the 17th section of the British statute, which says, " no contract for the sale of goods for the price of £10 or upwards, shall be good, unless the buyer shall accept part of the goods as earnest, or pay a part of the price ; or unless some memorandum or note of the bargain be in writing, and signed by the party to be charged by such contract," &c.   In this case the Court held, that a note or memorandum in writing of the bargain, was sufficient to satisfy the statute, without the consideration of that bargain (138) being in writing.   This is, in principle, a decision contrary to the former.   By a note appended to the case, Packard v. Richards, in 17 *Mass. R.* 144, it seems in 1821 the Court of K. B. unanimously affirmed the doctrine in the case Wayne v. Walters. These cases and the case of Goodman v. Chace, decided in 1816, are the only cases decided by the British Courts relating to the point under consideration.   But in the latter case, the point was waved.   In the United States, the first case on this subject is that of Sears v. Brink, in New York, in which the Court recognized the doctrine in the case of Wayne v. Walters, 3 *J. R.* 210.   The next case is that of Leonard v. Vredenburgh, in which the same doctrine is recognized, but not without some expressions of dissatisfaction, 8 *J. R.* 37.

The doctrine in Wayne v. Walters was mentioned in the case of Violet v. Patterson, 5 *Cranch R.* 142, in which it was thought by the Court, that the doctrine did not apply to the case then before them, so that this last case amounts to nothing.   The last American case I have found is that of Packard v. Richards, 17 *Mass. R.* 122.   In this case, Ch. J. Parker reviews the whole of the foregoing cases, so far as they relate to the question, whether the consideration to pay the debt of another must be expressed in writing, as well as the promise.

In this case the doctrine in Wayne v. Walters, and the N. Y. cases, are overruled. The Court express their views at large, and with more reason to my mind than any other case I have seen.

The case of Wayne v. Walters was always denied by Lord Eldon to be law ;  see Vesey, jun., exparte, Gordon.   In this case he decides expressly to the contrary of that case, 15 *V. jun.* 286.

Thus it appears that great authorities are arrayed on both sides of the question.

It has been said often, that the case of Wayne v. Walters was never well received in England, and that the great authority of the Court K. B. could not satisfy Lord Eldon, the British bar nor that great man Kent ; see Leonard v. Vredenburgh, 8 *J. R.* 37. In this view of the subject, the question is still open to us, to receive that decision which in the opinion of the Court, shall best comport with the words and reason of the statute of frauds.

In the act of this State, as well as that of England, the title is, "An Act to prevent frauds and perjuries."   Our act was passed in January, 1815.   What might have been

the evils intended to be remedied by the English act, I cannot at this remote period (139) of time undertake to determine with much certainty. But from the dicta of judges and lawyers, it may be supposed, that frauds and perjuries had become so common and alarming in their consequences, that the Legislature thought it expedient to provide a remedy. The 4th section of the statute of 29 *Charles II.*, was adopted by our Legislature. At the same session, they adopted the common law, and some of the British statutes, down to the time of the 4th of *James* I. The statute of frauds being subsequent, was not in force, and the Legislature thinking it a good law, enacted it with a view of preventing frauds and perjuries. But I cannot think at that time, either frauds or perjuries were so alarming as to require such a signal legislation.                .

Our Legislature, no doubt, enacted the statute more with a view to the future times, more in reference to what frauds and perjuries might arise, than with an eye to those already existing. The moral history of this country at that day, will afford but little light on the reason of making the statute. But when the British statute was passed, we know the moral condition of that country was desperate, but what the particular evils were which drew forth the statute, I have never learned.

We know that England had not long emerged from the horrors of a dreadful civil war, and that it was then rapidly assuming a permanently reformed government, whence it may be expected that real estate was thought to be rapidly rising in value, and investments of money in real estate presented a greater prospect of profit than any thing else. In our own country, after our short war, in 1816–17 and 18, men seemed to think the possession and ownership of real estate, was the chief human good. When lands rose to enormous prices, men parted with their money freely, without much regard to quantity, for land. If then, such might have been the case in England, we may suppose the Legislature thought lands too valuable to be passed by mere verbal agreement, and I do suppose, also, that witnesses could be found, and were found, who would swear a man's real estate away on a pretended *parol* agreement. To prevent such frauds, and to close the door to such perjuries, I suppose the statute was made. That part of the statute which it is our business to consider, says, " no action shall be brought upon any contract for the sale of land, unless the agreement or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or his agent." From the *peculiar manner in which* (140) this statute is worded, I am led to the conclusion that it was not intended the whole of this agreement or contract on both sides, should be reduced to writing; when the statute speaks of the action to be brought on a contract for the sale of land, it no doubt embraces in its view both sale and consideration. But it forbids the action being brought, unless something else collateral should first be done, and that is, that the agreement to sell be in writing, or at least a note or memorandum should be made, and this agreement or note thereof is to be signed by the party to be charged therewith. This latter requisition convinces me, that the Legislature did not intend that all matters relating to the price, and time when to be paid, must necessarily be contained in this note, memorandum or agreement; otherwise they would have declared that both parties should sign the agreement or note. I take the word agreement here in its popular sense, without reference to the consideration or reason for making it. A note or memorandum is something less than the main subject in detail, and if the note only says, witness that A. agrees to sell to B., a piece of land in fee, and A. should sign this, I hold the statute is satisfied as to A., but if B. refuses to

take the land, then B. must show on suit for a specific performance, such note signed by B. In my opinion, this is all the statute requires, and the vendor and vendee must each look to his own part of the transaction in case of future difficulty.

The decree of the Circuit Court is affirmed, with costs.

Wash, J., dissenting.

I dissent from the opinion of the Court on two grounds, mainly :

First. The bill seeks the specific execution of a contract, made by Keemle as agent for Bean, and there appears to me no evidence, either of his authority to contract, or of a contract executed, &c.; and

Second. I think the true construction of the statute of frauds, &c., requires that the consideration should be expressed in writing as well as the contract, and in this case there appears to me neither contract nor consideration, so expressed as to take it out of the statute.