WILLIAM GRUMLEY, Respondent, *v.* WM. G. WEBB, Appellant.

PER CURIAM.

1. *Equity — Statute of frauds — Accord and satisfaction — Receipt — Action barred by —* A receipt expressed to be in satisfaction of "all claims and demands," if not competent to prove a sale or conveyance under the statute of frauds (Wagn. Stat. 655, ¿ 2), is evidence of an accord and satisfaction; and, when coupled with the payment of money, would bar an action in equity, based on prior claims or demands, for a recovery of an interest in the lands of the party paying the money and holding the receipt.

2. *Equity — Statute of frauds — Part performance — Payment — Possession — Vendor cannot invoke the aid of equity, when.—* Even where a parol contract is in the nature of a purchase, and so embraced in the purview of the statute of frauds, if the purchase money is paid and the purchaser is in possession and holds a perfect record title, the vendor cannot invoke the active interposition of a court of equity to recover the property. Such a claim is inequitable and unconscionable, and has no equity which a court of equity will touch.

3. *Contract — Receipt embraces what matters — Construed, how.—* A receipt given in satisfaction of a judgment and "all claims and demands" does not, on its face, include matters not embraced in the judgment. But the receipt must be interpreted and construed from existing facts and in the light of surrounding and cotemporary circumstances. (Grumley v. Webb, 44 Mo. 456.) And if the parties to the receipt clearly and manifestly intended to include in it other claims besides the judgment, courts will interpret the contract accordingly.

Per BLISS, Judge.

1. *Equity — Statute of frauds — Performance — What acts take case out of — Estoppel.—* An unexecuted agreement for the sale or surrender of an equity may not, under the statute of frauds (Wagn. Stat. 655, ¿ 2), be enforced. But if the holder of an equitable claim receives money in payment for the same from one who has the legal title and the possession, gives him a receipt and discharge, and leaves him in quiet enjoyment of the property—does all all things, in short, which could be done in the settlement of his claim — he cannot afterward invoke the statute and say that his discharge was not in writing. His contract is executed. His equity is dead. And he is estopped by his own conduct from further urging his claim. In such case, the possession prior to the settlement having been adverse to the claimant, his subsequent acquiescence in it would have far greater significance than if possession were rightful or held under claimant.

Per WAGNER, Judge, dissenting.

1. *Agency—Power of attorney to compromise suit for client.—* An attorney employed in the usual way to conduct a suit has, in general, no authority to enter into a compromise without the sanction, express or implied, of his client.

Grumley v. Webb.

2. *Practice, civil — Supreme Court* — Res adjudicata. — When a case has been decided by this court, and again comes here by appeal or writ of error, only such questions will be noticed as were not determined in the previous decision. Whatever was passed upon will be deemed *res adjudicata* and no longer open to dispute.

3. *Equity—Statute of frauds—Divestiture of equitable title must be in writing.* —A voluntary divestiture of an equitable estate by the owner, for a valuable consideration, is in the nature of a conveyance of his title by bargain and sale, and under the statute of frauds (Wagn. Stat. 655, ? 2) cannot be proved by parol testimony. This proposition of law is sustained by the decision in Hughes v. Moore, 7 Cranch, 176. The case at bar is not one executed by possession and turning on part performance.

4. *Equity — Statute of frauds — Release proved, how.*—A release is not by act or operation of law, but by the act of the party releasing; and therefore the act can be proved only by a deed or conveyance in writing.

5. *Equity — Legal and equitable transfers.*— No difference in principle can exist between the transfer of a legal and that of an equitable estate.

### *Appeal from St. Louis Circuit Court.*

*Geo. P. Strong,* for appellant.

The cause of action in this case originated prior to the date of the discharge. All the facts upon which this suit is based were well known to Grumley when he made the settlement. The receipt, when interpreted in the light of all the facts and circumstances connected with the settlement, is a full discharge of the plaintiff's claims embraced in this suit. (Altham's case, 4 Coke, 305–6; Vedder v. Vedder, 1 Denio, 259; Hoes v. Van Hosen, 1 Barb. Ch. 398; Van Brunt v. Van Brunt, 3 Edw. Ch., N. Y., 16; 1 Show. 150, 154; Bell v. Bruen, 1 How. 169; Russell v. Rogers, 10 Wend. 479; Perkins v. Forniquet, 14 How. 313; Gray v. McCune, 23 Penn. 447; McGlynn v. Billings, 16 Verm. 329.)

The two suits virtually embraced the whole matter in controversy.

Grumley had his election to take the lease, with the rents and profits, or to take the value of the buildings. He could not have both. If Webb paid for the buildings, the rents and profits would belong to him. Grumley could not be forced to take the lease, nor ought he to be allowed to evade the effect of the settlement by alleging that he did not know that he could recover the

lease. He knew that Webb had it, and he knew all the circumstances under which it was obtained. With all this knowledge, he made no claim to the lease for more than four years, and brought suit for the value of the buildings. When that suit was settled and dismissed, all claim to that lease was relinquished. Grumley's delay in asserting any claim, especially after he knew the $7,000 suit was dismissed, and that Webb claimed there had been a full settlement, was a recognition of the fact of the settlement and a waiver of any of his rights. (See McNew v. Booth, 42 Mo. 193, as to what would be a reasonable time in which to assert a claim.)

The receipt should be so interpreted as to give effect, if possible, to all its terms. It should be held to apply to all claims of the same nature as those embraced in the judgment specified. General words are only rejected, or limited to the special recital, when the testimony shows that the parties could not be presumed to have had in mind the subject to which it is sought to apply them. In all other cases they should be allowed their natural and reasonable force. (Ramsdell v. Hylton, 2 Ves. Sr. 310; Van Brunt v. Van Brunt, *supra;* Moore v. McGrath, Cowp. 9, 11; Knight v. Cole, *supra;* Bell v. Bruen, *supra;* Haydell v. Roussell, 1 La. Ann. 38; 6 Bac. Abr. 632.)

The settlement was a full, fair and reasonable settlement. Defendant has paid for Grumley, as the accounts show, $11,593.75 profits on his own money, for a lease that was not worth over $6,000. Such a payment ought to be held to include all matters, all demands growing out of that property, up to March 7, 1865.

The receipt is a sufficient compliance with the statute of frauds. A release of a claim or demand is a release or settlement and extinguishment of all right to the thing out of which the demand arose. (4 Com. Dig. 96, §§ 20, 22, 24–5; Hughes v. Moore, 7 Cranch, 176; Perkins v. Forniquet, 14 How. 310; Altham's case, 4 Coke, 304–6; Dearborn v. Cross, 2 Cow. 48.) The plaintiff has received a large sum of money from defendant, who had reason to believe that he was paying for a full discharge of all claims and demands; he was led to that belief by the plaintiff.

Grumley repeatedly sent him (defendant) to Broadhead to settle without any limitation of authority. Broadhead did act as his agent, and did settle both suits. There was nothing to lead defendant to doubt his full authority, and plaintiff ought not now to be allowed to deny it. If Broadhead had no authority, and yet settled the second suit, and received from Webb, acting in good faith, a large sum of money in consideration of that settlement; and if Grumley, by his words or conduct, induced Webb to believe that Broadhead had authority, Grumley is estopped to deny that authority. ( Merchants' National Bank v. State National Bank of Boston, 10 Wall. 604; Hern v. Nichols, 1 Salk. 289; Farmers' Bank v. B. & D. Bank, 16 N. Y. 131, 133, 136; Welland Canal v. Hathaway, 8 Wend. 483.) In the case of the Merchants' Bank, the court say: " Smith, by his conduct, if not by his declarations, avows his authority to buy the certificates and gold in question; and the bank, under the circumstances, had a right to believe him." So with Col. Broadhead. He, by his conduct, avowed his authority to settle both suits, and under the circumstances Webb had a right to believe him.

All that is required by the statute of frauds is some memorandum in writing signed by the party to be charged or affected. The release or receipt is such a memorandum. Webb does not claim under Grumley but under O'Fallon. He has a title good against all the world except Grumley, who has a claim or demand to it; but Webb is in possession, and Grumley is desirous to assert this claim or demand. Now, when he releases that, he releases everything that he has — every right. How, then, can this court enforce a claim or demand which he has discharged?

When Webb settled for this claim and demand, he settled everything that Grumley could enforce, and secured " repose and quiet " from the only party who could disturb the title he holds from O'Fallon.

The language of the receipt is not only broad enough to cover this claim, but its language implies that there is a claim embraced in it against Webb alone, as well as a joint claim against Bigham & Webb. The judgment was a joint one. This claim is against Webb alone, and the receipt refers to such a claim.

*N. Myers*, with *Geo. W. Cline*, for respondent.

I. Although Webb procured the lease in controversy in his own name, yet the equitable title is in Grumley. (44 Mo. 444.)

II. The plaintiff, Grumley, has never in any way parted with his equitable interest in this new lease:

1st. Because he could part with it in the way of a voluntary transfer by a writing alone, in conformity to the requirements of the statute of frauds (Wagn. Stat. 655, § 2).

(*a*) Grumley's estate in the new lease is created "by operation of law:" it is sought to divest him of it, not in the same way, but by voluntary conveyance, in the way of bargain and sale. In all cases of voluntary conveyance of an "interest" in land, whether legal or equitable, parol testimony is inadmissible.

(*b*) This is not the case of rebutting, but of divesting an equity. It is not attempted to show that the equitable estate never did vest; but that after it had been vested a year and a half, the owner thereof voluntarily sold and parted with it. The defendant does not attempt to show by the receipt of March 7, 1865, that the equitable estate never vested in Grumley; but that, having vested more than a year previous, he, in the way of bargain and sale, parted with it. ·

A written memorandum in full conformity to the provisions and requirements of the statute of frauds is necessary. An equitable interest is as much within the statute of frauds as a legal interest. (Hughes v. Moore, 7 Cranch, 466; Millard v. Hathaway, 27 Cal. 119; Gratz v. Gratz, 4 Rawle, 434; Kelly *et al.* v. Stanberry, 13 Ohio, 426; Goucher v. Martin, 9 Watts, 107; Cravener v. Bowser, 4 Penn. St. 261; Simms v. Killian, 12 Ired. 252; Richards v. Richards, 9 Gray, 313; Bowser v. Cravener, 56 Penn. 132.)

2d. The defendant has no writing sufficient under the statute of frauds:

(*a*) Because there must be a designation of the land sold in the receipt, or in some writing to which the receipt refers. In the case at bar there is not the remotest or faintest reference to any interest in any land. The writing must show the whole contract,

without reference to parol proof. (Shied v. Stamps, 2 Sneed, 172; Pipkin v. Jones, 1 Hum. 325; Simmonds v. Catlin, 2 Caines, 61–66; Johnson v. Catlin, 2 Johns. 258; Bankman v. Kuykendall, 6 Blackf. 21; Bailey *et al.* v. Ogdens, 3 Johns. 419; Ellis v. Deadman's Heirs, 4 Bibb, 467.)

(*b*) Because the only writing the defendant has is a receipt for the judgment alone. The receipt itself includes nothing else. The sweeping clause "in full of all claims and demands" is to be restrained and limited by the previous special recital of the judgment. A general release is to be taken most strongly against the releasor; but where there is a special recital, and then general words follow, the general words are to be restrained and qualified by the special recital. (See opinion in Grumley v. Webb, 44 Mo. 444, and authorities cited.)

(*c*) This receipt, then, is not a memorandum conveying any title to any land. It is a mere receipt for the judgment of $11,522.54. It is sought to introduce verbal evidence, not to explain but to extend this receipt; to show by parol, not what it does cover, but what it does not cover. The case therefore shows an undivested equity in the plaintiff.

3d. Even if the statute of frauds were in no way applicable to this case, yet the evidence in the case shows clearly that Grumley did not receive the $6,500 for anything but the judgment of $11,522.54, the matter specially mentioned in the receipt; that it was not intended to include his right to the ten-year lease in controversy.

(*a*) Upon this branch of the case we submit there is no longer any question properly debatable in this court. Our review of the evidence shows that it is substantially the same as it was on the first trial. There is the same irreconcilable conflict. If, therefore, the case presents substantially the same aspect as it did when here before, it is no longer fairly open for debate. Perhaps it is admissible to ask the court to consider a new case, but it is certainly rather late to ask the court to reconsider an old one.

(*b*) But granting, for the argument, that the question is still open for debate here, we contend that (as justly remarked by the court in its original opinion) the conclusion is irresistible that the plaintiff in fact settled only for the judgment.

III. The $7,000 suit cuts no figure in this case. It sets up that Grumley had a right to remove the improvements before January, 1864, and sues Webb for damages for not allowing him to remove the buildings after the first of January, 1864. After the first of January, 1864, .the buildings belonged to O'Fallon, the lessor of the ground. Even had Mr. Webb been foolish enough to pay anything for this, he would be simply paying for what the law would not compel him to pay. The settlement of a claim to which one is not entitled can by no means affect a claim to which he is entitled. Further, the "buildings" are not co-extensive with the lease; they are merely an incident of the lease, and if paid for, do at best entitle one to the ownership of a certain quantity of bricks, the difference between which and a leasehold interest it does not require a legal mind to discover. Again, an interest in land will not be divested by a mere agreement to dismiss a suit. At best there should be an agreement to relinquish the cause of action. This of itself effectually disposes of this matter. There should at least be a *retraxit.*

Moreover, if that $7,000 suit had been of such a nature as that its settlement would defeat the plaintiff's present suit, then it would have to be so pleaded; and such a settlement would have to be in writing, as affecting, amounting to, and resulting in, a transfer of an interest in land. The writing, too, should have been signed by Grumley, or by some one authorized by him in writing. A moment's reflection shows this conclusively. Finally, the evidence, as reviewed above, shows that the $7,000 suit was not included in the settlement. The settlement included nothing but the judgment of $11,522.54. The evidence shows that Mr. Broadhead negotiated the settlement for Grumley, and had no authority to settle anything but the judgment. All Mr. Broadhead's acts outside of his express authority are void. (Holker *v.* Parker, 7 Cranch, 434, 460 ; Davidson v. Rozier, 23 Mo. 387; Wahrendorf v. Whittaker, 1 Mo. 205.)

CURRIER, Judge, delivered the opinion of the court.

The possession and legal title to the leasehold described in the petition is in the defendant, but the plaintiff claims to be the

equitable owner of it, and brings this suit to recover the rents and profits and to divest the defendant of title.

As an answer to the plaintiff's claim, the defendant avers a compromise and release of it. He sets up an accord and satisfaction in bar of the suit, alleging, in substance, that since the accrual of the cause of action sued on, the plaintiff and defendant have settled all matters in difference between them, including said supposed cause of action, and that the defendant, in consummation of such settlement, paid the plaintiff the sum of $6,500, and that the plaintiff accepted and received the same in full satisfaction of all claims and demands then existing in his favor against the defendant — the claim now in litigation, as the defendant alleges, being one of them.

These allegations are put in issue by the pleadings. The case is thus made to turn upon the evidence adduced in proof of the alleged accord and satisfaction.

At the trial, the defendant, for the purpose of proving the averments of his answer, offered and read in evidence a receipt dated March 7, 1865, which was duly executed by the plaintiff. It appears from this receipt that the defendant, on the day the receipt was executed, paid to the plaintiff the sum of $6,500, and that the plaintiff accepted and received the same as in full satisfaction of a certain judgment and "all claims and demands" then held by him against the defendant. So the receipt reads.

At first blush, the receipt seems to prove the defendant's case, since the cause of action sued on accrued prior to the execution of the receipt. That view, however, encounters objections. It is objected that the receipt fails to meet the requirements of the statute of frauds (Wagn. Stat 655, § 2); and further, that a true construction of its terms excludes the cause of action now in suit. It is proposed by construction to limit the effect of the receipt to the particular judgment therein set out and described.

The first objection is based upon the assumption that the plaintiff's equity constituted an interest in real estate that could not be sold or conveyed except by some instrument in writing which should meet the requirements of the statute of frauds in relation to such sales and conveyances.

It is then insisted that the receipt fails to meet these requirements. If that were so it would not invalidate the receipt as regards the use sought to be made of it here. It was not given in evidence to prove either a sale or conveyance, but to establish the fact of an accord and satisfaction which included and extinguished the plaintiff's equity. The plaintiff's objection as regards the point now under consideration is without force, unless it is shown that the plaintiff's interest in the leasehold was of such a nature that it could not be destroyed in the manner stated in the answer — that is, by an accord followed up and consummated in a complete satisfaction. The plaintiff's counsel cite and rely upon Hughes v. Moore, 7 Cranch, 466, as the strongest case to be found in the books in support of their position. But that case does not prove that the plaintiff's equity could not be extinguished by the accord and satisfaction evidenced by the receipt. It proves the direct opposite of that, as we shall presently see. In that case the equitable owner made a parol agreement, for a certain consideration agreed to be paid, to surrender and transfer his equitable interest in certain lands to the bargainees who held the legal title.

The agreement was not reduced to writing, nor was anything done in execution of it. The equitable owner nevertheless subsequently sued the bargainees for the purchase money, and it was held that he could not recover, the court deciding that the agreement was for the sale of an interest in land, and so within the statute of frauds — nothing having been done in execution of the agreement. But there is no vital resemblance between that case and the one now under consideration. There the suit was founded upon an *unexecuted* parol contract, and was brought to recover the unpaid purchase money.

Here (assuming that the receipt was intended to cover the matters now in litigation) the purchase money was paid down and in full, if the transaction can be regarded as partaking of the nature of a purchase. At all events the contract was executed, and upon that fact the present defense rests. The defendant is in possession and holds a perfect record title. He neither asks nor needs the assistance of the court. It is the plaintiff that is

calling on the court for help. He invokes the extraordinary power of a court of equity to enforce what he claims as an equitable right. .He agreed on the value of the supposed equity (assuming as before that the receipt covers the case — a point which will hereafter be considered) and has been paid that value in full. He accepted the sum so paid as a satisfaction, and abandoned his claim. With the consideration money in his pocket, he now seeks in a court of equity to recover the property itself! There is no equity here that a court of equity will deign to touch, and for the reason that the claim asserted is altogether inequitable and unconscionable.

The settlement, coupled with the $6,500 payment, extinguished the plaintiff's equitable interest in the leasehold, and left nothing for a court of chancery to act upon; and this view is amply sustained by the decision in Hughes v. Moore, the case cited and relied upon by the plaintiff's counsel. Chief Justice Marshall, in pronouncing the opinion of the court in that case, said: " To the majority of the court it seems that a compensation for the loss of the title to the land must be understood as a compensation for the land itself, and that the *receipt of the money* by Cleon Moore [answering to Grumley in this case] would not only have barred an action for damages, *but a suit in equity for the title*." And again: " The majority of the court is of opinion that, under the contract as stated in this count also, the *payment of the money* agreed to be paid would have *extinguished* the right of Cleon Moore [Grumley] to the land in question." That is precisely what is claimed by the defendant in the present action, namely, that the payment of the money, under the accord, extinguished Grumley's interest in the property, and barred a suit in equity for its recovery. The decision in Hughes v. Moore, instead of sustaining the plaintiff's theory, completely undermines and overthrows that theory in its application to the facts of the present litigation. (See Altham's case, 4 Coke, 305–6; Perkins v. Forniquet, 14 How. 315; Vedder v. Vedder, 1 Denio, 259.)

But the main question in the case is, treating the plaintiff's receipt as a good and valid instrument, sufficient to accomplish all the objects intended by it, what is its real scope and true construction? Does it include the claim asserted in this action?

In the execution of that instrument the plaintiff acknowledged the receipt of $6,500 and declared the same to be in full satisfaction of a judgment which he had recovered against the defendant and his former partner David S. Bigham, and that the sum so received was also "in full satisfaction of all claims and demands" then held by him "against said Bigham and Webb, *or either of them.*"

It appears from the receipt that the money was paid by Webb, and the discharge seemed to embrace several claims against Webb, as well as joint claims against him and Bigham. It was nevertheless held by this court, when this suit was here on a former occasion (see 44 Mo. 456), that the general words of the receipt, namely, the words "all claims and demands," construing the receipt upon its face and according to its terms, pointed to the judgment specifically named in the receipt, and that they had no reference to any separate or several liability against Webb, not embraced in the judgment. To that extent the construction of the receipt must be regarded as judicially determined. It is therefore settled judicially that the receipt *upon its face* did not include and discharge the cause of action upon which the present suit is founded. The court, however, did not stop there, but went on and held further that this narrow construction was not necessarily the true construction. It was held that the receipt, "like all contracts, must be interpreted and construed from existing facts, and in the light of surrounding and cotemporaneous circumstances."

Accordingly the court proceeded to inquire into these facts and circumstances, and a majority of the court, upon a review of the evidence as it then stood, reached the conclusion that the evidence then appearing in the record failed to show that the plaintiff "had any idea that the settlement included the second suit"—that is, the suit last commenced, which was pending when the settlement was effected, and which will hereafter be more fully referred to. The narrow construction was therefore adhered to, and an interpretation given to the receipt which narrowed its scope to the particular claim (the judgment) therein described. It will therefore be seen that the construction of the

receipt was made to turn, in the end, upon the decision of a question of fact, namely, whether the second suit was or was not understood by the parties to be included in the antecedent settlement. The court, upon the evidence then before it, failed to find the existence of such understanding, and accordingly held the second suit not to be embraced in either the settlement or the receipt. The judgment of the court below (which was for the defendant on the first hearing) was thereupon reversed and the cause remanded for a re-trial in accordance with the views announced in the opinion.

The re-trial was had, and resulted in a judgment for the plaintiff. The case is now here for a second review, and the question in regard to the scope of the settlement, and consequently of the receipt, is again up for consideration, but upon evidence materially different from that embraced in the former record. If the second suit was embraced in the settlement, then it is agreed that the receipt must be construed with reference to that fact, since otherwise the clear and manifest intention of the parties would be frustrated. If the second suit was included, and the receipt is construed with reference to that circumstance, then its general words, " all claims and demands," must have a broad application and be interpreted so as to include more than the named judgment. If they include anything beyond that, then the narrow construction must be abandoned and the general words of the receipt allowed to operate according to their usual legal import, and as including every claim at the time held by the plaintiff against the defendant, whatever its name or character.

It has not been claimed, and cannot be with any show of reason, that the receipt was less comprehensive than the settlement. The material question, therefore, is — as was the fact when the case was previously here — what did the settlement include? or, in other words, did it include the second suit?

The case was tried the second time in the court below *de novo*, in accordance with the mandate of this court remanding the cause, and the trial resulted in the accumulation of a very large amount of testimony, occupying some 500 pages of the record. That testimony I now propose to examine with reference to its bearings upon the question already propounded.

The evidence shows that at the time of the settlement, two suits were pending in favor of the plaintiff— one against the defendant and his former partner, Bigham, and the other against the defendant alone. The suit against Bigham & Webb was first commenced, and was brought to recover the rents and profits of the same leasehold which constitutes the subject-matter of the present suit, and which is described in the present petition. It was sought also by that suit to recover the title to the leasehold ; the legal title then, as now, being in Webb. The suit in its general objects was not materally different from the present one. The other and subsequent suit, which has been referred to as the "second suit," was against Webb individually, and was brought to recover the value of the material entering into the construction of the buildings which were standing upon the leasehold premises. This second suit was commenced in September, 1864, some six months before the settlement was concluded, and while the settlement negotiations were pending.

We shall be aided in determining the question whether that second suit was or was not included in the settlement, by a recurrence to the subject-matter of the two suits, to the negotiations . which culminated in the settlement, and to the dealings and relations of the parties to said litigation. The following facts are not in dispute : In October, 1855, the plaintiff was the owner of the leasehold in question. He was then in embarrassed circumstances, and had allowed ground-rent and taxes to accumulate against the property. The property was also subject to a deed of trust and to the encumbrance of a judgment lien. His affairs were in this embarrassed condition when he applied to Bigham & Webb, a real estate firm, composed of the defendant and said Bigham, to take charge of said leasehold and collect and apply the accruing rents.

The rents realized were to be applied to the payment of taxes and ground-rent, and to the liquidation of other liabilities then outstanding against the plaintiff. Bigham & Webb accepted the agency and entered upon the discharge of its duties. This was on or near the first day of October, 1855. In less than a week from that time, the plaintiff secretly withdrew from the

country and remained abroad for some four years. He did not return to St. Louis till 1859. In the meanwhile the leasehold was levied upon and sold under an execution issued upon the judgment which rested against it at the time of the plaintiff's abandonment of the country. The defendant became the purchaser at that sale, taking it, of course, subject to all prior liens and encumbrances.

The subsequent difficulties between the parties may be regarded as dating from that transaction. When the plaintiff returned from Europe in 1859, he called upon his agents, Bigham & Webb, and demanded of them an accounting and the revesting in himself of the title to the leasehold. These demands were not complied with as regards the rents which accrued after the above-mentioned execution sale, and as regarded the transfer of the leasehold itself. The defendant claimed both as his. The plaintiff thereupon commenced a suit against Bigham & Webb to recover the rents and to re-acquire the title to the leasehold, alleging in his petition that the defendant held the title as the plaintiff's trustee. It was asked that an accounting should be had, and that the title should be divested out of Webb and revested in the plaintiff.

The plaintiff, May 11, 1864, recovered a judgment against the defendants in that suit for the sum of $11,522.54, as the net balance of rents then in arrear to him. The judgment was so far erroneous and excessive that the plaintiff's counsel had no expectation of being able to sustain it. An appeal was taken, or arranged to be taken, and thus the matter rested for ten months, pending negotiations for a compromise settlement.

Subsequent to the rendition of this judgment, and while the negotiations were going forward, the plaintiff instituted another suit against Webb individually, being the action already referred to as the "second suit." The object of this suit, as has been stated, was to recover the value of the material entering into the construction of the buildings standing upon said leasehold, the defendant being in the possession and use of them.

It has already been stated that both the suits above referred to were pending and undisposed of on the 7th of March, 1865,

when the parties came together and effected their settlement. These suits were prosecuted by Col. Broadhead, as the plaintiff's attorney and professional adviser.

Soon after the rendition of the judgment for the $11,522.54, negotiations were set on foot, having for their object some sort of an adjustment between the contending parties. Col. Broadhead, on the part of the plaintiff, and Judge Krum, on the part of the defendant, appear to have taken a leading part in these negotiations. Everything that was done at all was done under their guidance, counsel and supervision. A settlement was effected, and they in their professional relations were parties to it; they were conversant with every detail, and I shall spend no time in arraying the evidence with reference to the establishment of the proposition that they acted intelligently and knew perfectly well what was proposed to be done and what was in fact accomplished. These eminent gentlemen both agree in the statement that the settlement included both suits.

Col. Broadhead testifies guardedly, but on that point he is clear and positive. He understood both suits to be included in the settlement, and testifies that he supposed his client so understood it also. He testifies that Judge Krum *insisted* upon including both suits; that he yielded to the demand; and Broadhead, on the part of the plaintiff, was the negotiator, as appears not only from his testimony but from that of his client. There is no doubt about the scope of the settlement as it was understood by the plaintiff's counsel, who had the matter in charge. He understood, and had the best of reasons for his opinion, for he was in a position to know the facts, that both suits were included. He testifies also that his "impression" at the time of the transaction was that "Grumley knew all about it." Whence came that impression? From what quarter was it derived, if not from his own client?

Col. Broadhead not only "understood" the second suit to be included in the settlement—he *acted* upon that understanding, and dismissed the suit on the very day of the settlement, and it has never been revived. The suit was not only dismissed—it was dismissed at Webb's cost. If the second suit was not

included in the settlement, why was Webb charged with these costs? It is not to be supposed that he would have paid them had he not believed that the dismissal meant something.

But the plaintiff swears, and the exigency of his case is exceedingly pressing on that point, that the dismissal was the unauthorized act of Col. Broadhead. This, to say the least of it, was placing Col. Broadhead in an undesirable position. The fact asserted is one not likely to occur; it is highly improbable, and requires strong support to secure a belief of it. It is not supplied by Col. Broadhead's mere want of definite recollection upon the subject, nor by the fact that no definite instructions to dismiss were given. Grumley's attorney was warranted in doing what was appropriate to the general scope of the settlement, without waiting for specific instructions in regard to the details of the transaction. The dismissal was a mere incident of the settlement, if the settlement included both suits. Besides, the plaintiff's conduct, subsequent to the settlement, shows that he had abandoned the suit; that it was not only dismissed from the records of the court, but from the plaintiff's care and attention.

The suit had been pending six months when the settlement was made. In the ordinary course of business the day for the trial could not be distant. Did the plaintiff interest himself about it? Did he make any preparation for the impending trial? Did he even consult his counsel on the subject? Nothing of the kind appears, and he swears that he was in ignorance of the dismissal until his cause had been out of court for nearly a year and a half.

Is such long-continued ignorance consistent with the idea that he believed himself to be a party to an important and warmly-contested pending suit? The suit was dismissed March 7, 1865, and the plaintiff's alleged claim laid dormant for nearly three years, and down to the commencement of this suit, February 6, 1868. The plaintiff's temporary absence in Memphis explains nothing. He was still in easy reach of his counsel, and his absence did not arrest the business of the courts, or stay the progress of his suit.

If the investigation were to stop here, and the case were to be turned upon its undisputed facts, and the testimony of the plain-

37—XLVIII.

tiff, coupled with that of his counsel in the former litigation, I should find it difficult to resist the conviction that the aforesaid second suit was included in the settlement, and that the entire litigation in regard to that leasehold was understood by both parties to be closed up and forever put to rest. But there is much more in the case that tends in the same direction, and the attitude of the controversy makes it necessary that I should refer to the remaining evidence.

The two suits pending at the date of the settlement related to the same piece of property, and were so connected that the mention of one of them would naturally suggest the other. Neither could have been overlooked or forgotten in the settlement. Suppose the parties took both suits into consideration, and that they intended to settle both, what papers would have been appropriate to that end? In one a judgment had been rendered; therefore a discharge of record was necessary in order to clear the records of the judgment lien; in the other no judgment had been rendered, therefore a mere dismissal was all that was necessary to clear the records of the court. But the dismissal did not discharge the cause of action; therefore a third party was necessary in order to extinguish that.

On examination, the papers actually executed on the occasion are found to meet perfectly all these conditions, furnishing a strong circumstantial confirmation of the correctness of the theory that both suits were included in the settlement. The papers referred to are as follows:

### THE ORDER TO ENTER SATISFACTION.

"Wm. Grumley v. David S. Bigham, Wm. G. Webb, and Charles Pond. In the St. Louis Circuit Court.

"I acknowledge to have received full satisfaction of the judgment recovered in the above-entitled cause, and authorize the clerk of the court to enter satisfaction of said judgment on the records.

(Signed) WILLIAM GRUMLEY.

"ST. LOUIS, March 7, 1865."

If the object of the parties had been to discharge this judgment and nothing more, no other paper than that copied above was necessary. Still the parties were not content with that, and

Grumley v. Webb.

the following papers were drawn up and executed oh the same occasion :

#### THE ORDER TO DISMISS.

"Wm. Grumley v. William G. Webb. In the St. Louis Circuit Court.

"*On the payment of the costs* in this case by defendant, this suit is to be dismissed. (Signed) SHARP & BROADHEAD.

"ST. LOUIS, March 7, 1865."

#### THE GENERAL DISCHARGE.

"Received from Wm. G. Webb six thousand five hundred dollars, which is in full satisfaction of a judgment recovered by me against said W.ebb and David S. Bigham, in the St. Louis Circuit Court, *and said sum is in full satisfaction of all claims and demands I have or hold against said Bigham and Webb*, OR EITHER OF THEM,* up to this date.

(Signed) WILLIAM GRUMLEY.

"ST. LOUIS, March 7, 1865."

In view of the facts already developed, is it possible to look at this array of papers and then come to the conclusion that the parties intended nothing more by them than the discharge of that single judgment? Yet that conclusion must be reached or the plaintiff's case is lost. For if anything was intended beyond the cancellation of the judgment, then the general words of the receipt, "all claims and demands," must be construed so as to take effect and carry out what was intended to be accomplished by them. As has already been remarked, if they are construed to include anything beyond the judgment, then they include every claim which the plaintiff may have had against the defendant at that time. It is, moreover, to be borne in mind that the papers were drawn up and executed under the advice of counsel among the foremost in the State. It is not to be supposed that they acted and advised without a legal reason for their conduct.

Besides all this, Grumley is not represented as a man destitute of sense. He knew all about the suits and the purpose of them. Did he sit down and read that general discharge, as the evidence shows he did, and that, too, under the eye of Col. Broadhead, and not have his attention arrested by that sweeping clause which declares that the $6,500 was paid and received as in full satisfaction of all claims and demands he then had or held against said Bigham and Webb, *or either of them ?*

---

* The capitals and italics are those of the court. [REP.

Grumley testifies that he read the receipt upon the special direction of his counsel, and that Col. Broadhead stood over him when he signed it. Broadhead testifies that the settlement included both suits ; that Krum so insisted, and that he " yielded." Thus understanding the matter, and standing over his client when the latter signed the receipt, he testifies that he "*explained*" the document to him.

Thus it appears that when the settlement was at its crisis, and upon the point of consummation, Broadhead and Grumley examined that most important paper which was to stand as enduring evidence of the scope and terms of the arrangement; that Grumley read it, and that Broadhead explained it to him. Broadhead knew that both suits were included in the arrangement — knew that the other party so understood it; and with all this knowledge he explained the receipt to his client. Did he give a full and true explanation according to his sworn statement of the understanding between him and Krum? or did he suppress and keep from his client's knowledge a material part of the transaction? There is nothing in the case to warrant a suspicion of concealment, and Col. Broadhead did not *forget* the second suit. It was present to his mind on that very occasion, as is shown by his written order to dismiss. The order bears the same date with the other papers, and Col. Broadhead testifies that it " looks like they [the three papers] all ought to go together ;" and there is no evidence to show the contrary of that.

I have hitherto considered the case with reference to its undisputed facts, as these facts are explained and illustrated by the plaintiff's testimony and that of his former counsel. I now recur to the testimony on the part of the defendants.

Judge Krum was Webb's counsel. He testifies that on the 7th of March, 1865, Webb and Grumley came to his office and announced to him that they had " come to a settlement of all their difficulties," or words to that effect; that it was then stated to him that Webb was to pay $6,500 and the costs of both suits. He was, as he testifies, requested to draw up the proper papers evidencing the settlement. Before doing so, as he testifies, he addressed the parties as follows: " Now, gentlemen, I under-

stand that this is a settlement of the whole controversy about this property between you." He states that he understood both to assent to this, and that he then proceeded to draw up the papers. The papers are all in his handwriting—that is, the three papers already given. It appears that there was a prior understanding between Broadhead and Krum, that the latter, in case a settlement was effected, should favor the passing of the money to be paid by Webb through Broadhead's hands. Krum testifies that in pursuance of this understanding, and for the further reason that he wished the counsel of the opposite party to be cognizant of the papers, he proceeded with Grumley, after the papers were drawn up, to Col. Broadhead's office, where, as he says, the transaction was closed in his presence. He is not certain whether Grumley accompanied him, or whether he might not have met him at Broadhead's office by appointment. Webb corroborates Krum fully as to what occurred in the latter's office in Grumley's presence.

Now, if these witnesses (Webb and Krum) are to be believed, their testimony establishes the fact that the second suit was included in the settlement, and that Grumley knew it. Why should they not be believed? As regards what occurred in Krum's office —and that is the important matter in this connection—Grumley is the only witness that contradicts them. He sets up an *alibi*, and sustains it by his own oath. He swears that he was not in Krum's office on the day mentioned, or on any day near that time. He is in direct conflict with Webb and Krum. The testimony on this point is irreconcilable. Who is to be believed? If Grumley was not in Krum's office on the 7th of March, 1865, then the testimony of the witnesses who affirm that he was, is to that extent a pure invention. The interested parties may be treated as balancing each other, but what shall be done with the testimony of Judge Krum? His statements, if credited, are decisive of the case. He is sustained by Webb and contradicted by Grumley.

Grumley denies that he was in Krum's office as stated. He denies, too, that Broadhead had any authority to dismiss the second suit; and denies further, and over and over again, and

in forms the most positive, that prior to the day of settlement Broadhead was authorized to settle the first suit for less than $11,522.54, that being the full face of the judgment. Yet it is an undisputed fact in the case that prior to that date, Broadhead had been negotiating for months for a compromise settlement of the judgment; that he offered to discount from its face thousands of dollars, and that he finally acquiesced in a settlement at considerably less than half the face of the judgment; and further, that Grumley instantly ratified his acts in that behalf and gave a discharge in full of all claims and demands. According to Grumley's own statements, Broadhead acted throughout the negotiations as a mere volunteer and intermeddler, and without the slightest shadow of authority. But it is manifest from the case — and counsel do not attempt to controvert the fact — that Broadhead's negotiations in respect to the judgment were duly authorized. Grumley's denials on that subject must therefore go for nothing. If these are set aside as wholly unreliable, what becomes of his denials of Broadhead's authority to dismiss the second suit? His rash swearing in regard to the former, shakes the credit of his testimony in regard to the latter. He no more denies authority in the one case than in the other. His unsupported statements cannot be accepted as sufficient to countervail the testimony of both Webb and Judge Krum, the latter being a pecuniarily disinterested witness. It is alike more reasonable and charitable to suppose forgetfulness on the part of Grumley rather than invention on the part of the opposing witnesses.

It is an entire mistake to suppose that there is any serious conflict between Judge Krum and Col. Broadhead. They differ as to details, but agree perfectly as to the substance of the settlement — that it was understood to include both suits.

If the two suits were included, and Grumley so understood, the surrounding circumstances of the settlement cease to be of any moment; for they are important only as showing the understanding of the parties as to the scope of the settlement.

It may be remarked, however, that Col. Broadhead's recollection of the details of the transaction are not distinct, and he admits his inability to explain some of the undoubted facts of

the case so as to make them harmonize with certain of his impressions. He thinks, for instance, that Judge Krum was not with him and Grumley, in his (Broadhead's) office, when the papers were examined and executed, but he admits that $6,500 of Webb's money was there, and he is not able to explain its presence in his and Grumley's control, with no one there to represent the owner. Assume Judge Krum's presence — and he swears positively that he was there — and the transaction is relieved of its obscurity. Krum must have been present.

I have, to this point, considered the merits of the case apart from the merits of the contested settlement. That may deserve a brief consideration. When this cause was previously here, the record was quite barren of facts showing the state of the rent account between the plaintiff and defendants in the first suit. It was shown that a judgment had been rendered for $11,522.54, as for rent unaccounted for. The fair presumption was that the judgment, although excessive, was nevertheless somewhere in the vicinity of what was right. The evidence before us now dispels that illusion. The account is now presented and appears in the record in detail. Instead of showing an unpaid balance of $11,522.54, it shows a balance of only $4,089.19, thus evincing an error in the judgment of $7,433.35. The account, or the results of it, as the evidence shows, were exhibited to Grumley before the settlement, so that he acted with a knowledge of the facts.

Then again, the second suit indicated a claim of considerable gravity; $7,000 was claimed, and the claim did not appear to be extravagant for a dozen houses. But it is now shown, and by one of the plaintiff's witnesses (Rhodes), that the buildings sued for, in their then condition, were cheap and nearly worthless structures. He values them at from $50 to $100 each, and he says there were twelve or fourteen of them. Suppose they were worth, in the aggregate, $1,500; that sum added to $4,089.19 makes $5,589.19, and this latter sum represents the total of the plaintiff's claims, under both suits, as those claims stood on the day of the settlement — Bigham & Webb being credited their commissions, and no interest being computed on either side.

The balance of interest was in favor of the plaintiff, although Bigham & Webb were considerably in advance in the earlier stages of the account. These facts were all known to the plaintiff when he received the $6,500 and gave a receipt, expressed to be in full of all claims and demands, and the receipt was explained to him by Col. Broadhead, who knew that all the claims in litigation were included in the settlement according to his understanding of it, and according to the understanding of the counsel of the opposite party. Did he succeed in making his client understand the receipt as he understood it?

I deduce from the evidence, upon a careful review of it, the following summary of leading facts:

1. Col. Broadhead was the authorized and fully trusted representative of the plaintiff in his negotiations for a settlement. He was of the opinion, as he testifies, that Grumley would have settled for $3,000 had he advised it.

2. In these negotiations Broadhead came to a clear and definite understanding with the counsel of the opposite party that the settlement should include both suits. That was *insisted* upon and he yielded to the demand.

3. It therefore appears that the plaintiff's counsel, Col. Broadhead, knew that the settlement was understood to include the second as well as the first suit, and that it was understood by himself and the opposite party to be embraced in the receipt.

4. Thus knowing and understanding the facts of the settlement, he expounded the receipt to his client. If the exposition was a fair one — and the contrary is not pretended — Grumley was thereby advised of the scope of the settlement and the import of the receipt as the same were understood by Broadhead and the opposite party. In a word, he was made to "know all about it," and Broadhead testifies, as we have seen, that he supposed at the time that such was the fact.

5. This matter is not left to inference alone. Grumley's knowledge is shown affirmatively by the testimony of Judge Krum. I find it to be true, as testified by this witness, that Grumley was in the witness's office on the day of the settlement in company with Webb, and that he there recognized the settlement as including the subject-matter of both suits.

6. Grumley's subsequent conduct accords with this view, and is inconsistent with the notion that he believed the second suit was left to be fought out in the courts. He gave it no attention thenceforward for nearly a year and a half, or at least not enough attention, according to his own swearing, to ascertain that it had been dismissed, untill it had been out of court nearly eighteen months.

7. The settlement, assuming it to have embraced both suits, was still fair and reasonable. The evidence shows that the $6,500 paid by Webb was a full equivalent for the balance due on the rent account, and for the value of the houses sued for in the second suit.

Now the receipt, as we have seen, must be construed in the light of these facts, and, being so construed, the result is in no way doubtful. The narrow construction, limiting its effect to the specific judgment, must be abandoned, and the broader construction, which gives effect to its general terms, adopted. These terms are comprehensive enough to embrace and discharge the second suit, and all causes of action then existing in favor of the plaintiff against the defendant, whether joint or several, and that is their effect. .

From this it follows that the judgment of the court below, which was in favor of the plaintiff, must be reversed and the petition dismissed. I recommend that disposition of the case.

Judge Bliss concurs. Judge Wagner dissents.

BLISS, Judge, concurring.

I concur in the opinion of Judge Currier. The case has been remanded and re-tried upon an amended answer, and upon the principles settled when it was formerly before us. The record is much fuller than before, developing new and material facts; and whatever, then, the contradiction and doubt as to the intention of the parties in using the general language of the receipt, that intention is now made clear; and it is apparent that both Mr. Grumley and his attorney and Mr. Webb and his attorney understood the receipt alike, and, though the judgment was the chief matter in controversy, that they intended to cover by it not only

the judgment but the matter then in suit and everything pertaining to the lease. It is undisputed that Mr. Webb and his counsel and Mr. Grumley's counsel so understood it; that the former at all times insisted upon this comprehensive settlement, and the latter conceded it. Mr. Webb and Mr. Krum insist that the pending suit was canvassed between them and Mr. Grumley, and that both matters were settled. Mr. Broadhead understood that the whole matter was settled, supposed Mr. Grumley so understood it, and explained the receipt to him. Every circumstance tends to show that all parties so understood it. To trust, then, to Grumley's present recollection that he did not so understand it, would reverse all my ideas in regard to the preponderance of evidence.

A question of law not before considered is now insisted on, to-wit: that the right of Grumley to the renewed lease and to the property upon the leasehold premises could not be surrendered by parol; or rather, that the scope of the receipt cannot be extended by parol so as to affect the plaintiff's claim to the leasehold. Had this point, when before presented, been considered and sustained, it would have dispensed with any inquiry into the understanding of the parties.

The statute of frauds applies equally to legal and equitable estates in lands. As a rule, neither can be " assigned, granted, or surrendered;" nor can valid contracts be made for their assignment, grant, or surrender, except by note in writing. But if there were no exception to this rule, the statute could be made a potent engine of fraud. Hence the clear and marked exception that when the parol agreement has been performed in part, by taking possession and paying the purchase money, the agreement may be enforced and the title wrung from the vendor, notwithstanding the statute. To refuse to compel him to deed would work a fraud, and the letter of the act yields to the spirit of the law, and he is forbidden to set it up. So in regard to the sale or the surrender of an equity. An unexecuted agreement may not be enforced, but one who sells his equitable interest in land, receives the consideration, and yields possession, will not be permitted to say afterward that the assignment was not in writing; or, if the holder of the equity surrenders to him who has the legal

title, accepts the consideration and gives possession, the contract is executed, his equity is dead, and no court of equity would enforce it. Thus a parol rescission of a contract for the purchase of land is a surrender of the equity of the purchaser, and I have never known an instance where such purchaser, who, upon an agreement to give up his claim to the holder of the legal title, has received the value of his equity, and if he was in possession, has surrendered it, has been afterward enabled to enforce such equity.

So a deed with a separate condition of defeasance is but a mortgage, and the mortgagor holds an equity of redemption; and yet by canceling the defeasance, being unrecorded, this equity may be surrendered; given up to the holder of the paper and record title without any writing whatever, and the equity will be discharged. (Harris v. Phillips Academy, 12 Mass. 456; Trull v. Skinner, 17 Pick. 213.) I might give other illustrations of the unsoundness of the claim, that because certain parol contracts or transactions are within the statute, therefore they are void and courts will wholly disregard them. They are not necessarily void. An executed parol agreement is valid; "if it is fulfilled by the parties, it is as good as any other contract" (5 Litt. 98), and even if only partly performed, equity in a proper case will enforce it.

But in this case we need not go as far as courts uniformly go. We need not say that a verbal contract to sell or surrender the plaintiff's claim, if founded upon a good consideration, would be specifically enforced, if it should be found necessary for a defendant to appeal to a court for that purpose; but it seems very clear to me that the plaintiff himself could not come into court for its equitable aid, as though no such surrender had been made. The plaintiff had an equitable, unadjusted claim upon the renewal of a certain leasehold. He prosecuted a claim for the improvements upon the leasehold property; subsequently the parties settle their controversies, including this suit and all matters pertaining to the lease, and the plaintiff receives the money demanded. Everything was done that could be done in execution of the settlement; the money was paid, a receipt was given, the

suit was dismissed, and the defendant was left in the quiet enjoyment of the property. No deed of release was necessary, for defendant had a perfect record title, and no possession could be delivered, for it was already had; and now, with the money in his pocket, the plaintiff again comes into a court of conscience to enforce his original claim, and being confronted by his discharge, replies that it was not in writing, and that he is entitled to the same aid as though it had never been given. The claim so affronts all my ideas as to the office of a court of equity that its statement seems to me to refute it. No greater fraud could be practiced than to enforce a claim thus relinquished. The plaintiff is estopped from pursuing it.

In Campbell v. Johnson, 44 Mo. 247, the doctrine of estoppel was applied to a similar state of facts. A purchaser of land, complaining of the insufficiency of the deed, brought suit for the purchase money. It was paid back to her and a receipt taken. Afterward she brought suit for the land itself, and was held to be estopped by her previous settlement and receipt.

I have looked at all the cases cited, and have searched for others, but have found none where a judgment to enforce an equity was given in the face of a receipt and discharge, an accord and satisfaction, the discharge not being in writing; although in some, where the court found that there was no such discharge in fact, *dicta* are thrown out in aid of the finding, as to what might have been its legal effect.

If this were a proceeding for specific performance of a parol agreement, we should require evidence that the character of the possession, if rightful without such agreement, was changed, and that the purchaser held under the seller; but in this case no such showing is necessary, for these reasons: first, the claim supposes the possession wrongful; it was certainly adverse, and acquiescence in it has a very different significance from that which it would have if it were rightful or held under the other party; and, second, one may be estopped in equity by transactions between him and his opponent from prosecuting one kind of claim, although such transactions might not suffice to lay a foundation for affirmative relief on his behalf.

I have said nothing in regard to a distinction which might be made between a parol discharge by the equitable owner of land by contract or other writing, which gives the holder an express interest, and by one who may have a claim by operation of law, not embraced in the terms of any agreement, and which can only be reduced to certainty by judgment; nor have I spoken of the fact that this discharge was not by parol, but that a receipt in writing was given, though not technically a release, yet broad enough in its terms, if so understood, to cover every claim legal or equitable the plaintiff could have had; but I have chosen rather to recognize the broad principle that courts of equity will not be made the ministers of fraud by enforcing claims that have been paid off and discharged.

WAGNER, Judge, dissenting.

When this case was here on a former occasion (44 Mo. 444) it was decided that Webb held the property in trust, that he possessed the dry legal title, but that the equitable interest was in Grumley, and that the latter was entitled to have the leasehold interest assigned to him, and also to have an account of the rents and profits.

It was further held that the compromise entered into between the parties, by which Grumley took and received $6,500 for the judgment which he had obtained against Webb for $11,522.54, did not include a second action which he still had pending against Webb, and was therefore no bar to the prosecution of this suit.

When the case was remanded, the court below rendered judgment in conformity with the opinion of this court, and appointed a commissioner to take an account, who, after hearing the proofs, stated the amount due the plaintiff, and his report was confirmed.

The defendant has now appealed, and it is sought to draw a different conclusion from the facts from what was arrived at by this court upon the former hearing. The decree declaring Webb a trustee and holding the title for the benefit of Grumley is not attempted to be disturbed.

From a careful examination of the evidence, I have been wholly unable to find any material difference between the evi-

dence as now presented and what was given on the former trial. There are slight alterations of statements and unimportant differences of phraseology, but the facts are substantially the same. It would be useless and profitless to undertake anything like a thorough review of all the testimony. All attempts to reconcile and make it harmonize are perfectly futile, for it is conflicting throughout.

Bigham, who was employed by Webb as his agent to try and effect a settlement with Grumley, shows clearly that the judgment alone was settled. He says that he was employed by Webb to settle the judgment, and nothing else. He offered Grumley several times either $6,000 or $6,500 for the judgment; understood that it included everything, and that the buildings were to belong to Webb; but don't know that he said anything to Grumley as to whom the buildings should belong to, and he knew of no other difficulty between the parties but the judgment.

Grumley swears positively that no one ever spoke to him about settling anything but the judgment for $11,522.54, and that he received the $6,500 for that, and for that alone.

The testimony of Broadhead shows conclusively to my mind that nothing but the judgment was settled, though he states during the course of his examination that he understood, or had an impression, that everything was settled. He says that both Krum and himself thought that the judgment was for too much, and he and Krum negotiated for a long time for its settlement. Krum insisted that the error should reduce the judgment to $5,000, while he insisted that it should not reduce it to less than $7,000, perhaps not less than $8,000 or $9,000, and finally they agreed on $6,500. Now what was this agreement for? Why, most plainly, for that about which they had been negotiating—the judgment.

Broadhead testifies that he closed the settlement with Krum. Krum testifies that Broadhead is mistaken, and that they did not close the settlement. He says he drew up the papers in accordance with an agreement which Webb and Grumley had made in his presence, and that he then and there drew up and read to the parties the three papers, "or rather two of them," and that he

then went with Grumley to Broadhead at the latter's office, and there passed the papers and the money. Broadhead, on the contrary, says that he got the papers from Krum, and that Grumley was not present when he got them, and is sure that Grumley never saw the order of dismissal of the $7,000 suit, one of the papers drawn up by Krum, and that Grumley was not present at any time when he spoke to either Krum or Webb; that he, after getting the papers from Krum, closed the matter himself with Grumley, at his own office, and that neither Webb nor Krum was there; and that Grumley came to his office to settle, by an appointment with him, and he is quite sure there was no one with Grumley when he came. And that is Grumley's evidence, for he says that after having refused to compromise with Webb, Bigham and Brown, on the morning of the settlement, Broadhead called upon him, and then finally prevailed upon him to accept $6,500 for the judgment; that upon giving his consent Broadhead told him to come to his office in half an hour and he would have the papers; that he went to Broadhead's office in half an hour, and Broadhead had the papers and the check, and there settled with him, with no one present but Mr. Haeussler and Mr. Sharp. And this is wholly and fully sustained by Broadhead; for though he says he understood everything was settled, yet he also says he spoke to Grumley about nothing but the judgment, and had no authority to settle anything but the judgment; had no authority to dismiss the $7,000 suit, but dismissed it entirely on his own responsibility, and Grumley knew nothing of its dismissal, and did not see the order of dismissal, and insisted on his going on with that suit.

Such is the statement of Broadhead and Grumley, while Krum says that Webb and Grumley made the agreement in his office, and he expressly asked them if the settlement was to include all matters in controversy between them, and they said that it was.

The evidence is contradictory, but the conclusion seems to me irresistibly plain that Grumley never agreed to nor contemplated settling the $7,000 suit pending in the court at the time.

The judgment for upwards of $11,000 was obviously for too much. It was a lien on Webb's real estate, and he could not use

it, and therefore was anxious to have the matter adjusted. All the negotiations were about the judgment. Krum, the attorney for Webb, contended that it should not be more than $5,000, while Broadhead, the attorney for Grumley, insisted upon $7,000, or perhaps $8,000 or $9,000. In this position of the case they agreed upon $6,500. It is obvious that the judgment was alone in contemplation when the adjustment was made. If Krum and Webb thought otherwise, surely Grumley did not, and without his concurrence there could be no agreement, for the mutual assent of both parties was necessary to make a binding contract. The facts surrounding the execution of the papers go to strengthen and sustain this view. Two papers only were submitted to Grumley for his signature. Both these related to the judgment; the one acknowledged the receipt of the money, and the other was an order for entering satisfaction on the record.

The third paper prepared by Krum, dismissing the suit, was not presented to him, nor did he know anything about it, but it was signed on the same day by his attorneys. There is something in this transaction that goes entirely to rebut and dispel the presumption that Grumley ever intended to compromise the $7,000 suit, or that he assented to any disposition being made of it. While Broadhead seemed to think that everything was settled, he clearly states that nothing was said about anything but the judgment. He had no authority from Grumley to settle the suit, and consequently Grumley would not be bound by any arrangement he made; for it is settled law that an attorney employed in the usual way to conduct a suit has in general no authority to enter into a compromise without the sanction, expressed or implied, of his client. (North Mo. R.R. Co. v. Stephens, 36 Mo. 153; 1 Pars. Cont. 117.) But the simple dismissal would amount to nothing, and would not preclude another suit being instituted for the same cause.

Some stress is laid on the fact that Grumley went to Memphis, and was gone more than a year, and paid no attention to the suit, and thence the inference is sought to be drawn that he knew it was abandoned. But this presumption or inference will not hold good. In the crowded state of the docket in the St. Louis

Circuit Court, it is sometimes years before a case is reached. It is not usual for a client to attend the court to give the case his personal attention before it is reached. He employs an attorney who attends to the matter and advises him when his presence is required.

Besides, Grumley made repeated inquiries of his counsel concerning the suit. The fact appears to be that Broadhead had no confidence in the suit. He was satisfied that it was not maintainable, and therefore was willing to abandon it. He might have been right in his views of the law, but that should not operate to Grumley's prejudice.

While I think it is clear that Grumley never intended to compromise, and did not compromise, the $7,000 suit, the fact is patent that there is some conflict in the evidence. Now the receipt specifies that the money was received in full satisfaction of the judgment. Is it not natural to conclude that if the pending suit was intended to be included, it would also have been specified in the writing? Both matters were of importance and covered distinct suits, and it is incomprehensible that if both were expressly settled, one should have been specifically designated and the other left entirely out. It was clear that the parties' minds were directed to the judgment and that only.

If the pending suit as well as the judgment had been presented to the minds of the parties, it is natural to suppose that the language used would have given some indication of it. And this would be especially the case when we consider that the writing was drawn up by Judge Krum, who has spent a long life in the profession.

When this subject was considered by the court when the case was here before, we held that the receipt given in full satisfaction of the judgment, and specifying also in full of "all claims and demands," would not bar the prosecution of this suit unless it were shown to have been intended by the parties to include the $7,000 suit; and as the evidence was contradictory, we construed it according to its legal import. The authorities were examined, and the rule deduced as the settled doctrine was, that language, however general in its form, when used in connection with a par-

ticular subject-matter, will be presumed to be used in subordination to that matter, and will be construed and limited accordingly.

The case is essentially the same as it was when it was here before, and ought not to be again re-examined; for where a case has been decided by this court, and again comes here by appeal or writ of error, only such questions will be noticed as were not determined in the previous decision. Whatever was passed upon will be deemed *res adjudicata* and no longer open to dispute. (Overal v. Ellis, 38 Mo. 209; Roberts v. Cooper, 20 How. 467.)

There is another question to be considered, and that is the statute of frauds. Although Webb procured the lease in his own name, yet the equitable title is in Grumley. Has Grumley in any way ever parted with his equitable interest in this new lease?

I think he could only part with it in the way of a voluntary transfer by a writing in conformity with the statute. Grumley's estate in the new lease is created " by operation of law," and it is now sought to divest him of it not in the same way, but by voluntary conveyance in the way of bargain and sale.

The doctrine is that in cases of voluntary conveyance of an interest in land, whether legal or equitable, parol testimony is inadmissible. This is a case of divesting an equity; it is not attempted to show that the equitable estate never did vest, but that after it had been vested a year and a half, the owner thereof voluntarily sold and parted with it.

The statute of frauds provides that " no leases, estates, interests, either of freehold or term of years, or any uncertain interest of, in, to, or out of any messuages, lands, tenements or hereditaments, shall at any time hereafter be assigned, granted or surrendered, unless it be by deed or note in writing, signed by the party so assigning, granting or surrendering the same, or their agents lawfully authorized by writing, or by operation of law." (Wagn. Stat. 65, § 2.)

This section extends to and embraces all interests in land, equitable as well as legal. This construction is well settled. (Browne on Frauds, § 229.)

The only case relied on to evade the statute, and turn the cause in favor of the defendant Webb, is Hughes v. Moore, 7

Cranch, 176.  It was an action of assumpsit.  The declaration stated that Moore was owner and proprietor of a plat and certificate of survey for lands lying in Kentucky, for which he was entitled to a patent from the government of that State, and that Hughes without authority transferred that plat and certificate in the name of Moore to himself ; by which wrongful act a patent issued for the land to Hughes, to the injury of Moore ; that afterward Hughes promised to pay Moore the sum of seven hundred pounds for the said injury and loss of the said land assigned as aforesaid ; the plaintiff Moore (defendant in error) at the time agreed to the terms, and to accept of the said compensation " in full of all claims and demands for the said land, and for the injury aforesaid."  That was the second count.  The third count stated the equitable title of Moore and the injury, etc.  It then stated a conversation " concerning a compensation for the loss and a liquidation of the damages sustained by Moore, by reason of the misconduct of Hughes, and of vesting him, Hughes, with the legal title to the land ; and that it was agreed that Hughes should pay Moore in satisfaction of the damages, etc., the sum of seven hundred pounds, etc., which Moore agreed to accept in full compensation for his just claims as aforesaid."

To each of these counts defendant Hughes pleaded several pleas; among others, that neither the promise nor any memorandum thereof was made in writing.  To this plea the plaintiff demurred, and the court below sustained the demurrer.  The unanimous opinion of the Supreme Court was delivered by Chief Justice Marshall.  As to the second count he says : " The correctness of this decision depends entirely on the application of the statute of frauds to the contract stated in the declaration.  Cleon Moore is averred to have been the proprietor of a plat and certificate of survey on which Hughes & Darby obtained a patent by using his name without authority.  This tortious act did not divest Moore of his equitable title.  The land in equity was his.  Did he part with his title by the contract stated in the declaration ?  The answer must, in the opinion of the whole court, be in the affirmative.  He agreed to accept of the said compensation in full of all claims and demands for the said land, and for the

injury aforesaid. This, then, was an agreement to sell his equitable title to the land for the sum of seven hundred pounds. The court can perceive no distinction between the sale of land to which a man has only an equitable title, and a sale of land to which he has a legal title. It is therefore the unanimous opinion of this court that the judgment upon the demurrer to this plea ought to have been in favor of the defendant below."

On the third count the court divided, but the majority were of the opinion that "a compensation for the loss of the title to the land must be understood to be a compensation for the land itself, and that the receipt of this money by Cleon Moore would not only have barred an action for damages, but a suit in equity for the title." The judge then goes on to remark that "if this opinion be correct, then the contract is substantially for the sale of land, and to be valid ought to have been in writing."

But in commenting upon the fourth count it is said: "It seems to the court that this compensation was in lieu of the patent itself, and must have been intended to extinguish his right to the patent." There was no doubt in the minds of the court as to the sale of the equitable interest being within the statute of frauds. This principle was broadly decided, and is given by Judge Curtis in the head-note, in his edition of the report, as the only principle decided. The majority of the court evidently hesitated in coming to the opinion that the compensation was to be considered in lieu of the patent, and that it barred a suit for the land. The language used is extremely cautious, and while the case is often cited as a leading authority to maintain the proposition that a promise to pay a sum of money in consideration of the release of an equitable title is within the statute of frauds, I cannot find that it has ever been followed in any other case for the further purpose of extinguishing title upon parol agreement and compensation.

In Millard v. Hathaway, 27 Cal. 119, a case entirely parallel with the one at bar came up for adjudication. There the holder of the equitable interest sued the party having the legal title for a conveyance. The latter in his defense set up a settlement, a refunding of the money and a parol lease. The plaintiff's estate,

as in this case, was created by evidence of facts, which by operation of law give him an equitable title. Upon this state of the case the court says: "It is alleged in the answer that after the conveyance by C. W. to E. V. Hathaway, the plaintiff released and discharged him (E. V. Hathaway) from all claim, right or title in and to said described lands. This defense presupposes that the trust laid in the complaint once existed, and seeks to avoid it on the ground of the new matter stated. The burden of proving the defense was with the party alleging it.

"The court has found against the allegation directly, and when specially moved to amend its conclusions of fact by finding that the release was at least proved by parol, the motion was denied. We have attentively examined the parol proofs as they stand relative to the question. Parol evidence was freely introduced on both sides, and we are satisfied that the preponderance is with the result that the court arrived at. But if the court refused to find the release or discharge alleged, on the ground that the fact could be proved by written evidence only, as is claimed by the appellants, still we consider that the court did not in that particular mistake the law. As already remarked, the defense went upon the supposition that the plaintiff had originally an equitable estate in the land, but maintained that the estate had become extinct by release or surrender to the holder of the legal title. A release is not by act or operation of law, but by the act of the party releasing, and therefore the act can be proved only by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing."

The Supreme Court of Pennsylvania says that no difference in principle can exist in the mode of transferring a legal and an equitable estate. (Cravener v. Bowser, 4 Penn. St. 261; 56 Penn. St. 132, 140.)

In North Carolina, Ruffin, C. J., says: "In all contracts concerning the sale of an interest in lands, the statute of frauds requires a writing signed by the party sought to be charged." (Simms v. Killiam, 12 Ired. 252.)

So in a case in Ohio, the court says: "First, this is an agree-

ment without consideration and not binding; and, secondly, it is within the statute of frauds, and void. No interest in land, equitable or otherwise, passes by parol only. True, a parol agreement executed by possession will be enforced. But an equitable interest once acquired in land cannot be parted with except by writing, or by the same means that it was acquired." (Kelley *et al.* v. Stanbery *et al.*, 13 Ohio, 408.)

In Goucher v. Martin, 9 Watts, 106, the court tersely announces the doctrine and declares that "it is a general rule that no estate or interest in land shall pass but by deed, or some instrument in writing, signed by the parties; and it is immaterial whether the interest be legal or equitable, as an equitable interest is an interest in land which comes within the words and spirit of the statute of frauds. * * * The very object of the statute is to prevent the divestiture of a title to real estate, equitable or legal, by the introduction of loose and intermediate proof of a contract which the law requires should be made in the most solemn form."

In Gratz v. Gratz, 4 Rawle, 411, Kennedy, J., speaking for the court, says: "The terms of the act against fraud I think are sufficient to embrace equitable as well as legal interests in lands. The words are 'all leases, estates, interests of freehold, or term of years, or any uncertain interest of, in or out of any messuages, manors, lands, tenements, or hereditaments,' etc. * * * The term 'interests' being here used without any other words to qualify or restrain its general and most extensive signification, I am unable to discover any good reason why it should not be considered and held to extend to equitable interests in lands as well as legal."

In like manner the Supreme Court in Massachusetts hold that "it is well settled that equitable as well as legal interests in land are embraced within the statute of frauds." (Richards v. Richards, 9 Gray, 313.) To the same effect is the case of Smith v. Burnham, 3 Sumner, 435; and also Toppin v. Lumas, 30 Eng. Law & Eq. 427.

The authorities abundantly and conclusively show that all interests in land, whether equitable or legal, are clearly within the statute of frauds, and that neither estate will pass by parol,

Grumley v. Webb.

but requires an instrument of writing to render a transfer of any validity. There is no distinction to be drawn between the two descriptions of estate. The language of the statute itself is so plain that it is not susceptible of any other interpretation. If an equitable interest can be passed without writing, a legal interest can be passed as well. And the very statement of such a proposition is preposterous. To allow the pretended parol agreement in this case to be outside of the statute, or even to operate without writing, effectually demolishes the statute and renders it nugatory, and is opposed not only to its express language, but is in conflict with every well-considered case on the subject.

For the reasons given in the foregoing opinion, I entirely dissent from the judgment of the majority of this court, and think that the decree rendered in the court below should be affirmed.

## On Motion for Rehearing.

### PER CURIAM.

1. *Practice, civil — Supreme Court —* Stare decisis.—Where, upon a second appeal to the Supreme Court, the two records are the same, the former findng should control, unless injustice to the rights of parties would be done by adhering to the first opinion.

### Per WAGNER, Judge, dissenting.

2. *Statute of frauds — Sale by parol — Transfer of possession — Payment of purchase money.*—Where an equitable estate is sold by parol, a transfer of possession is essential to take it out of the statute of frauds. The mere payment of the purchase money will not have that effect.

*N. Myers,* with *Geo. W. Cline,* for the motion, pressed the point that the evidence in the two cases was essentially the same, and quoted extensively from the testimony of Krum and Broadhead as given at the two trials. It was urged that the words of the receipt, "or either of them," were common in legal documents, and meant simply "jointly or severally;" that Broadhead's statement that he "explained" the receipt to Grumley, on which the court laid so much stress, amounted to nothing; that such a statement was not evidence, but a legal conclusion; that what he said, what Grumley said, whether the explanation was before or after the settlement, did not appear. Counsel also contended that Webb's statement at the second trial,

showing a balance in Grumley's favor of $4,089.19, was purely *ex parte*, and admitted in evidence below simply as a part of the *res gestæ*, showing what Webb claimed, not what was in fact due; that in Webb's statement he charged himself with no interest, but debited Grumley with 8 per cent. commissions amounting to $1,417.78 ; that on his own showing, after deducting his commissions, Webb owed Grumley, on January 1, 1864, $5,506.97; that had Grumley received possession on his return from Europe, and a new lease, as the court said he should have done, he would have had rents up to January 1, 1864, worth, according to Broadhead, from $8,000 to $9,000, and the lease from 1864 to 1874, worth, as conceded, not less than $12,000 besides — in all about $20,000 — instead of all which he received $6,500, a large part of which he has paid for attorneys' fees, made necessary by Webb's unjust refusal to surrender.

As to the application of the statute of frauds, the following is in substance the argument of counsel :

Judge Currier noticed none of the authorities cited except the case of Hughes v. Moore. That was a suit at law to recover a sum of money verbally agreed to be paid to plaintiff, first, as compensation for the loss of his equitable title ; and, second, in lieu of all the damage done plaintiff by the misconduct of the defendant in depriving plaintiff of the title. The case before this court is not at law, but in equity ; it is not to recover a sum of money, but to divest the title to real estate.

The opinion of Judge Bliss is short, and turns on this sentence : " One who sells his equitable interest in land, receives the consideration and yields possession, will not be permitted to say afterward that the assignment was not in writing ; or, if the holder of the equity surrenders to him who has the legal title, accepts the consideration and gives possession, the contract is executed, his equity is dead, and no court of equity could enforce it."

Undoubtedly, that is the law ; but it is not the law of this case, for the reason that the main element of the principle — to-wit, the transfer of possession — is not in this case. No one has ever pretended that Grumley delivered possession to Webb after March 7, 1865. Webb has held possession continuously ever

since 1855. If the pretended purchaser is in possession before and at the time of the alleged contract, his continuing in possession amounts to nothing, and is to be ascribed to his original possession and not, to the alleged contract. (Price v. Hart, 29 Mo. 173 ; Young v. Montgomery, 28. Mo. 605 ; Bean v. Valle, 2 Mo. 109 ; Poag v. Sandifer, 5 Rich. Eq. 181 ; Aitkin v. Young, 12 Penn. St. 15–24 ; Armstrong v. Kattenhorn, 11 Ohio, 271 ; Brennan v. Bolton, 2 Drew. & W. 355 ; Jones v. Peterman, 3 Serg. & R. 543 ; Phillips v. Thompson, 1 Johns. Ch. 149 ; Frame v. Dawson, 14 Ves. 387 ; Wills v. Stradling, 3 Ves. 381.)

Again, the mere payment of purchase money amounts to nothing. (Purcell v. Miner, 4 Wall. 517 ; Price v. Hart, 29 Mo. 173 ; Goucher v. Martin, 9 Watts, 107; Frame v. Dawson, 14 Ves. 387 ; Armstrong v. Kattenhorn, 11 Ohio, 271 ; Church of the Advent v. Farrow, 7 Rich. Eq. 383.).

Further, no improvements have been made in part performance of the contract. The only improvement made was in 1864, a year before the making of the alleged agreement. The act of part performance must result unequivocally from the agreement, and be such as would not have taken place but for the agreement. (Purcell v. Miner, 4 Wall. 517 ; Moore v. Small, 19 Penn. St. 461 ; Osborne v. Phelps, 19 Conn. 68 ; Woods v. Farmare, 10 Watts, 195 et seq.; McMurtrie v. Bennett, Harr. Ch. 124 ; Wack v. Sorber, 2 Whart. 390.)

Finally, to take the case out of the statute on the plea of part performance, the contract itself must be established by "indubitable proof" in "every part." (Purcell v. Miner, supra, and other authorities above cited.)

The court also overlooked this point made by us. At the time of the settlement, March 7, 1865, the only matters in controversy were the judgment for the rents of the old lease, $11,500, and the $7,000 suit for the value of the buildings. Had both of these been settled for the $6,500 it would not have affected the present suit for the new lease, because the buildings are not co-extensive with the new lease ; they are merely an incident of the lease. The bricks were worth but $500, the lease not less than $12,000.

BLISS, Judge, delivered the opinion of the court.

The plaintiff moves for a rehearing, first, upon tne ground that the court has mistaken the record in supposing that it differed. from the former one, and, argumentatively, that we are bound by the former finding upon the facts.

We have distinctly recognized the former opinion upon questions of law as governing the law of the case. As the record stands, we could scarcely go further. A general mandate has gone down to try the whole case *de novo* upon the principles so settled, and the record of the trial has come back increased over the old one by hundreds of pages. If we are bound by a former finding of the facts, why a new trial? Why was not a transfer of Grumley's equity adjudged, and only an account of the rents directed? It is folly to say that the facts are concluded; it is our duty again to consider them, and especially to ascertain whether the new features of the evidence throw any light upon the case. If the present record were the same as the old one, the former finding should control us, unless "injustice to the rights of the parties would be done by adhering to the first opinion" (Chamber's Adm'r v. Smith's Adm'r, 30 Mo. 156), but it is not the same.

I have looked with increased anxiety to see what the plaintiff meant by releasing not only Bigham & Webb, but also Webb, against whom, individually, he was pursuing a separate claim. When the case was formerly here, I felt great doubt upon this vital point. The evidence was conflicting; there was difference of opinion, and I yielded my doubts to what then seemed to be the equities of the case. But the evidence now makes it clear that the $6,500 was a fair equivalent for the claims then in litigation; and there is no doubt whatever that Webb paid that sum with the full understanding that it satisfied every demand.

Mr. Krum "insisted" upon including everything in the settlement, and Mr. Broadhead yielded to it. This fact is new and important, and rests upon the undisputed testimony of Mr. Broadhead. Webb understood that everything was settled; his counsel so understood it; Grumley's counsel so understood it, and, so

Grumley v. Webb.

understanding, "explained" the receipt to his client, and supposed, when the facts were fresh in his memory, that "Grumley knew all about it." The fact of this explanation is also new and significant, coming as it did from a party who understood the settlement to embrace everything. Upon the controlling point of the case which so hung in doubt, does not this new evidence throw light? To my mind it greatly contribuues to remove the obscurity of the transaction, and in connection with the conduct of the parties and the other evidence, it gives a significance to the general language of the receipt in harmony with its terms. Against all this, against the positive testimony of Mr. Krum and Mr. Webb, given now as before, against the understanding of Mr. Grumley's counsel, his acts in making the settlement, dismissing the suit, explaining the receipt to his client, the apparent abandonment of the case by the latter, and against the general equities of the case as they now appear, we are required to assume as truth the unsupported recollection of Mr. Grumley, and because of a former finding! If the last record presents nothing new, I was greatly deceived as to the former one.

Second. A new and further ground is now urged in support of the motion, that if the settlement covered the suit then pending for the value of the buildings, it did not embrace the plaintiff's claim upon the leasehold. In other words, Mr. Grumley's counsel present him in the attitude of prosecuting a claim to recover the value of the improvements upon the premises, consisting entirely of buildings; and having succeeded in that, now seeking to recover back the buildings themselves, in their improved condition, in a suit for the leasehold. The remarkable prosperity of the city, with the repairs and fitting up of the buildings, may have so enhanced the value of the leasehold as to make it now an object of pursuit. But the claim will not avail him, both because of its inherent vice, and because the whole matter of the lease was covered by the settlement.

In the decision of this cause it was held that the general words of the receipt were broad enough, unless otherwise understood, to embrace and discharge not only the second suit, but " all causes of action then existing in favor of the plaintiff against the defend-

ants, whether joint or several," and that such was their effect, so far as any claims pertain to or grow out of the lease. The point now made was not overlooked, though the argument of counsel and the language of the court was directed almost entirely to the pending suit. But the settlement between Messrs. Broadhead and Krum, as they state it, not only included the second suit, but "the whole thing." Mr. Broadhead testified that "Judge Krum insisted upon a settlement of the whole thing. I am confident of that; I yielded to that." And Mr. Krum testifies that Grumley recognized the settlement as including "the whole controversy about this property," and that the parties, as he understood them to say, "had come to a settlement of all their difficulties." That Mr. Broadhead here details the facts as they actually occurred is not denied; that he explained to Grumley the receipt evidencing this sweeping settlement is not denied; that he was therein frank and faithful to his client is not questioned; yet it is still insisted upon that Grumley was left in the dark as to the true character of the settlement, and that, too, in face of the fact that he read and signed a receipt which declared in express terms, and in language to which men usually attach but one meaning, that the $6,500 was accepted as a full satisfaction of all claims and demands then had or held against the defendant.

But I will not pursue the subject further. The sweeping words of the receipt harmonize perfectly with the sweeping character of the settlement, and it is perfectly evident that the parties intended a settlement which should embrace everything, and leave nothing respecting the leasehold for future adjustment. To disturb such a settlement at this late day, in the view of a majority of the court, would be to take a step which there is nothing in the record to justify.

With the concurrence of Judge Currier, the motion is overruled. Judge Wagner dissents.

WAGNER, Judge, dissenting.

A motion for a rehearing was filed in this case and has been overruled by a majority of the court. As reasons for that action

it is again reiterated that the case is essentially different from what it was when the record was in this court before, and that new and important evidence has developed the fact and made it perfectly clear that the settlement entered into between Grumley and Webb, by which the former received $6,500 for his judgment, was a final adjustment of everything between the parties, and effectually precludes Grumley from the further prosecution of this suit. But this assumption rests on mere assertion. A few detached and fragmentary sentences are wrested from the context in the evidence, and, thus contorted, are sought to uphold and sustain this view. As stated in the previous dissenting opinion in this case, I claim that all the material evidence is substantially the same in both cases. It would be a just and legitimate mode, in the determination of a controversy like this, for those who assert the existence of certain facts to show those facts by the record; but such a course has not been pursued, and I apprehend if it had been attempted it would have proved a sheer failure. The facts mainly hinge upon the testimony of two witnesses, Krum and Broadhead. They were the attorneys, and it was principally through their instrumentality that the compromise in reference to the first judgment was brought about. Grumley, it may be said, is an interested party, and his evidence may be regarded only so far as it is borne out and corroborated by the surrounding facts and circumstances. As for Webb, his course and conduct in this whole matter has been such as to show that he is utterly unworthy of credit.

I have compared the testimony of Broadhead and Krum on all the material parts, as taken on both trials, and here insert the same in parallel columns.

| TESTIMONY OF BROADHEAD ON FIRST TRIAL. | TESTIMONY OF BROADHEAD ON SECOND TRIAL. |
| --- | --- |
| "Was attorney for Grumley in the $7,000 against Webb, and also in the suit of Grumley v. Bigham, Webb & Pond. There was judgment in the last suit for $11,500. I was satisfied the judgment was too large. | "Recollect the suit of Grumley v. Bigham, Webb & Pond, in which the judgment of $11,000 was recovered. I was counsel for Grumley. Was his counsel also in the $7,000 suit. Recollect the negotiations for settlement. |
| "After the judgment was obtained there was a negotiation for its settlement between myself and Judge Krum, | Negotiations were entered into to settle the case between Judge Krum and myself. |

Grumley v. Webb.

and finally we agreed on a compromise on March 7, 1865, and settled for the amount paid.

"The negotiation was with regard to this judgment of $11,500. This $7,000 suit against Webb alone did not engage my attention much, for I had pretty much abandoned all hope of recovering the judgment obtained. The settlement was finally made at my office, but the negotiations were had at Krum's. I signed the order of dismissal of the $7,000 suit. Grumley signed the other two papers relating to the judgment.

"I got these papers (the receipts) from Judge Krum. He drew them up in conformity with agreements which he and I had. Judge Krum gave me a check for $6,500. My understanding was that this settled the whole suit between the parties. Grumley gave me no special authority to dismiss the $7,000 suit. Grumley never gave me any authority to dismiss that $7,000 suit. I dismissed it on my own responsibility. I had no authority to settle that suit. My understanding was that it was included in the settlement. My understanding was that the settlement included all pending matters of controversy between the parties. Think that Grumley signed the papers at my office.

"Cannot recollect that Judge Krum came to my office with Grumley with the papers, nor can I say that Grumley was present when I got the check from Judge Krum. I cannot say that I took out my fees in any other cases than the one where we had judgment. Grumley went, shortly after the settlement, to Memphis, in the beginning of 1865, and wrote to me repeatedly to go on with this $7,000 suit. He spoke to me when he came back here afterward about this $7,000 suit, and it seemed to be his idea that the suit was still pending. I do not recollect ever speaking

"I saw the judgment was too large. * * * * * * * "I think we were entitled to between $8,000 and $9,000. * * * Judge Krum thought we were entitled to about $5,000. The $5,000 and $8,000 were the amounts that divided us. The matter was finally adjusted for $6,500. I called on Grumley at Third and Washington avenue on the morning of the settlement. I think it was after Judge Krum and myself had agreed upon the $6,500. I am not positive whether he had agreed or whether I saw him there to get him to agree to it. At any rate I had made up my mind to settle at $6,500. Judge Krum and myself, I think, had come together at those figures. The most distinct matter that I recollect of in regard to the settlement is the fact that I settled the amount with Grumley in my office and paid him over the money.

"I settled with Grumley at my office. *None present but myself and himself;* Mr. Sharp was in the office and may be Mr. Haeussler was in the office. I recollect distinctly of calling to see Grumley on Third and Washington avenue, but what about I do not recollect now; I think it was to urge him to make a settlement.

"Do not recollect where I settled with Judge Krum, but my impression is that Judge Krum gave me the check at his office. I have been thinking about that a good deal, and that is my best impression. There was no one present but him and myself. *That I am very positive about.*

"I am quite sure Grumley was not present when Judge Krum and myself had any talk about this matter. Do not recollect whether the receipt was given first or the check, or whether they were both given at the same time.

"Grumley signed the receipt in my office. I am quite sure no one was

OCTOBER TERM, 1871. 607

Grumley v. Webb.

to Grumley about settling the $7,000 suit. Judge Krum and I contended for different amounts. There was an error in the judgment. It was for too much. Judge Krum insisted the error should reduce the judgment to $5,000, and I stuck at $7,000, may be $8,000 or $9,000. I advised Grumley to take $7,000. We finally agreed on $6,500. After Grumley came back from Memphis he insisted on the $7,000 suit going on; seemed not to know that it had been dismissed. *I never told him that it was, or that the costs had been paid.*

"Saw Grumley at Third and Washington avenue, where he was clerking, on the morning of the settlement, and made an appointment with him to meet me. He came to my office by appointment to settle with me. I am quite sure there was no one with Grumley when he came to settle with me. I don't think Grumley was present when I got the papers from Judge Krum. Grumley was not present at any time when Webb or Krum was present.

"When I saw Grumley the day of the settlement, at Third and Washington avenue, I did not yet have the papers. I got them from Judge Krum afterward.

"Grumley never saw the order of dismissal of the $7,000 suit. I am sure he did not."

present when Grumley and I had any settlement about this matter.

"Do not recollect whether Judge Krum gave me the order for dismissal at the same time he gave me the other papers. *I do not think Grumley ever saw the order of dismissal.*

"Do not recollect whether I saw Grumley at his store *the day* of the settlement. Recollect I saw him at the clothing store, but can't say whether the settlement was made that day or the day after. My best recollection is that it was made the same day. Grumley came to my office, I believe, the same day I saw him in his store, but can't say how he got the information that I had the money for him. I went to see Grumley that day, because, although he had authorized me to settle the matter, I would not take the responsibility of settling for any man without his consent, although Judge Krum and myself had agreed upon the settlement. In what manner exactly the papers passed through my hands, I don't know. I saw Judge Krum repeatedly about this matter. Judge Krum wanted the settlement should include both cases. The main matter in my mind was the judgment. Judge Krum wanted to include the other suit. I had not much faith in the other suit. Don't know whether the settlement was to include the other suit, from the fact that the other suit was to be dismissed. I inferred that it was to be dismissed by agreement. *I don't think I was authorized to settle anything but the judgment.* Don't recollect that I ever told Grumley that the suit was dismissed at or about the time of the settlement. My impression was that Grumley knew about it. I have no distinct recollection of telling him about it until his return from Memphis. * * * My impression is that I charged Grumley a fee only in the case in which judgment had

been obtained. * * * My understanding was that the settlement was to cover both suits.

"My impression about the matter is that Judge Krum and I had agreed on $6,500, and I went to Grumley to see whether he would agree to it, and then the papers were drawn up. That is my impression merely. I got the papers; got them from Judge Krum, I think; think Judge Krum gave me the check. I have no recollection of any one being present when Judge Krum and I had anything to do with this case. No one was with Grumley when he came to my office on the day of the settlement. I don't know of Grumley's ever taking the matter into his own hands at all. If he did, I did not know it. I don't recollect of Judge Krum ever telling me that he had settled with Grumley. If there was any negotiation between the parties, I never heard of it.. *Don't know that Grumley was aware that I was settling the $7,000 suit*, and that Webb was to pay the costs. Had I told Grumley to take $3,000 for his judgment, I am satisfied he would have done it. The judgment is the only thing I recollect talking to Grumley about. I can not give any satisfactory explanation of how I came to settle the $7,000 suit."

I will now in like manner refer to the testimony of Krum:

| TESTIMONY OF KRUM ON FIRST TRIAL. | TESTIMONY OF KRUM ON SECOND TRIAL. |
|---|---|
| "I was present when the terms of the settlement which led to the execution of these papers were discussed. Both parties were present. I drew these papers while Webb and Grumley were sitting by my table in my office. | "Know the parties. Was counsel for Webb in a suit brought by Grumley against Bigham, Webb & Pond; and also in another suit against Webb alone. I attended personally to both suits. |
| "Webb remarked something to this effect : 'Well! we have now come to a settlement;' and stated the amount that he agreed to pay, and that was $6,500. He was to pay $6,500 to settle the whole controversy, in respect to the whole of those leasehold premises. | "Know of attempts to compromise after decree of $11,522. Webb authorized me to make a settlement of the whole matter in regard to the leasehold premises. I attempted to do that; consulted Mr. Broadhead. Mr. Broadhead was attorney for Grum- |

The settlement covered both suits. Webb was to pay the costs in both cases, and the pending suit of $7,000 was to be dismissed, and I was instructed to draw the papers accordingly. I stated: 'Now, I understand this to be a full settlement of the whole controversy,' and Webb and Grumley I understood to assent to it. I then wrote those two papers — that is, the receipt for $6,500, and this direction to the clerk of the court to enter satisfaction of the $11,000 judgment on the record; *and also this memorandum dismissing this $7,000 suit, and read them in the presence of both parties.* Webb had a check for the amount of $6,500. Went with Grumley to Broadhead, at Broadhead's office. Webb paid costs in both cases. Do not know whether I saw Grumley sign the receipt or not.

"Mr. Broadhead is mistaken, as he and I did not close the controversy. At the time of that settlement, the only matters of controversy were the matters involved in the two suits, that is to say, the judgment of $11,522.54, and the pending $7,000 suit; but I understood that this was a settlement of all controversies between the parties. I drew up the two papers signed by Grumley, and the one signed by Sharp & Broadhead. Sharp & Broadhead signed the order of dismissal. I may have had them sign it because I may have thought the clerk of the court would not know Grumley's signature. The clerk of the court would have known Grumley's signature to that as well as to the paper directing the entry of satisfaction of the judgment. I do not know why I did not have Grumley himself sign that order directing the dismissal of the $7,000 suit. The $7,000 suit was included in that settlement, and was to be dismissed. That I am positive of; as sure of it as of anything."

39—VOL. XLVIII.

ley. We did not arrive at any adjustment.

"One morning, after I had had my last interview with Mr. Broadhead, Webb and Grumley came to my office. They took a seat near my table and had a conversation, and then turned round and stated the object of their call.

"Webb said: 'We have at last come to a settlement of all our difficulties.'

"Webb stated the amount he was to pay, and one of the two said that Webb was to pay the costs of both suits, and they desired me to draw up the necessary papers. As I was about to do so, I said: 'Now, gentlemen, I understand that this is a settlement of the whole controversy about this property between you,' and I understood them to assent to it.

"When they assented, I then turned round to my desk and wrote these papers, or rather *two of them.*"

[Papers here read in evidence and set out *in hæc verba.*]

"I allude to the one, the satisfaction in discharge of all claims, dated March 7, 1865, and the one acknowledging satisfaction of the judgment. I have marked the three papers A, B and C. I read A and B in the presence of both parties. * * * I won't undertake to say whether I read this at the same time — that is, the order of dismissal. Perhaps I did. If I wrote that there I read that to them also. Think I wrote that at my office. After I had read these papers, Mr. Webb handed me his check for the amount, $6,500, and requested me to see what the costs would be. That was in the presence of Grumley. These two papers were signed and given to Grumley. Grumley and I then went over to Broadhead's office. Mr. Broadhead had requested me to have the funds pass through his hands. The order of dismissal was signed at the same time

by Sharp and Broadhead, I think. Am quite sure Grumley was present when I passed over the check. Think I proposed to Broadhead on the part of Webb to pay $5,000. Broadhead and myself both agreed there were errors in the decree of $11,522.54. We differed perhaps $1,000 or $2,000. Broadhead and myself never concluded anything.

"It seems to me I had seen Webb and Grumley together in regard to this settlement, previous to the time above stated, when they came to my office. I might have got the impression from the fact that I had been informed that they had been talking together.

" I drew up the three papers A, B and C in my office; think I read them to Grumley. I think I am certain about that. My conviction is very clear upon that point.

"I am quite positive that I read the three papers to Grumley there at my office. I think I did. The paper marked C is signed by the firm name of Sharp & Broadhead. The signature was written by Mr. Broadhead. I had Mr. Broadhead sign that order of dismissal because I thought the clerk of the court might not know Grumley's signature if he signed it; therefore I had it signed by Sharp & Broadhead, so that the clerk of the court would dismiss the $7,000 suit. I suppose the clerk of the court would have known Grumley's signature to that as well as to the other. I can give no reason other than the one just given why I had Grumley sign *two* of these papers, and Sharp & Broadhead *the order of dismissal.*"

The above constitutes the material portions of the testimony of both Broadhead and Krum, taken at the first and second trials. An examination of it shows most conclusively that there is really no difference. In substance and sense it is precisely the same. Some paragraphs are changed so as to stand in different order

in the arrangement, and the phraseology in some instances is changed; but it would puzzle the most acute and refined intellect to point out any real difference in substance. To talk about harmonizing the evidence of these two witnesses is simply ridiculous and absurd. In essential parts they flatly and squarely contradict each other. The truth is, the matter was faded and dim in their minds, and they had different impressions. But one thing is abundantly apparent, and that is that Broadhead had no authority to compromise and dismiss the $7,000 suit, and that Grumley was wholly ignorant that any arrangement had been made respecting it until after his return from Memphis, many months subsequent. Broadhead unequivocally disclaims any authority from Grumley to compromise this suit for $7,000, but has an impression that it was to be dismissed. If the judgment and suit were both included in the settlement, why was not the order for the dismissal, as well as the other two papers, signed by Grumley? When they want a receipt that will bind Grumley, and an order for entering satisfaction on the record, then his signature is procured; but the order of dismissal is strangely and unaccountably withheld from him. It would not do to say that the clerk would not know his signature, for the clerk would know it as well in the one case as in the other. The parties were willing to risk his signature in the matter of the receipt and the entry of satisfaction on the record. Why not risk it also to the order of dismissal if that came within the terms of the agreement? No attempt has been made to answer this question, and I imagine it would be found very difficult to answer. Broadhead says that he cannot give any satisfactory explanation of how he came to settle the second suit; and Krum says he cannot give any satisfactory explanation of how it happened that Sharp & Broadhead signed the order of dismissal, instead of Grumley. In these statements I am of the opinion that they are both correct. This examination of the evidence, in connection with my prior dissenting opinion, must suffice. One of the concurring judges, to evade the statute of frauds, uses this language: "One who sells his equitable interest in land, receives the consideration and *yields possession*, will not be permitted to say afterward that the assignment was not in

writing; or, if the holder of the equity surrenders to him who has the legal title, accepts the consideration and *gives possession*, the contract is executed, his equity is dead, and no court of equity could enforce it." I readily admit that this is the law, but it has no application to this case.

The transfer of possession, which is necessary to take it out of the statute, is wholly wanting. The mere payment of the purchase money does not take the case out of the operation of the statute, and there is not one particle of evidence to show that Grumley ever delivered possession to Webb in pursuance of this pretended agreement. Webb's possession was wrongful, and Grumley never acquiesced in it. The record is entirely barren to support the proposition of law above enunciated.

Again, if we admit for the sake of the argument that the $7,000 suit was compromised, it in nowise bars Grumley from recovering in this suit. That suit and the present one are totally different as respects the subject-matter. That was purely for personalty, this is for realty. The $7,000 suit set up a right in Grumley to remove the buildings before January 1, 1864, and alleged that Webb refused to allow their removal after January 1, 1864, thereby damaging him $7,000; and a demurrer had been sustained to the petition. The action was founded on the supposition that the buildings were mere personal property, and Webb's refusal to allow them to be removed amounted to a conversion. Nothing was said about the interest in the leasehold, nor was it thought of at the time. The sale of some old buildings was never intended to carry with it a valuable interest in lands. The buildings are not co-extensive with the lease, but are simply incident to it, and the sale or conversion of the buildings would not convey the interest in the lease. This suit is now for the equitable interest in the lease, and it has no identity with the $7,000 suit, which it is alleged was settled, but which I wholly deny.

My conclusion on the whole case is that the decision was wrong, and that a rehearing should be granted.

### SEPARATE OPINION OF JUDGE CURRIER.

I have examined this case with care, and have already fully expressed my views upon it. I have now re-examined it, but find no occasion to recall, modify or explain the views and positions previously taken, or for a further prolongation of the general discussion. Justice to the court and the cause, however, demands that some notice should be taken of the remarkable dissenting opinion filed under this motion.

That opinion starts out with the proposition that the disputed facts "mainly hinge upon the testimony of two witnesses, Krum and Broadhead." It then undertakes to set out and display the testimony of these witnesses *in extenso* in "all its material parts." It is the grave inaccuracy of these recitals of the evidence that chiefly requires attention.

The scope of the settlement and Grumley's knowledge of it were the vital facts submitted for investigation. Was the settlement sweeping, including all causes of difference? Did Grumley know of its real character? These were the questions to be considered and decided. Now, the dissenting opinion, instead of stating, omits and totally ignores the most material parts of Broadhead's testimony that bears directly upon these issues. I think the same omissions will be found in the statement and brief of plaintiff's counsel.

Broadhead not only testified that Krum "wanted" to include the second suit, and that he "understood" it to be included, but he says, with emphasis, that the second suit was in fact included, and that Krum *insisted* upon having it so. He says: "JUDGE KRUM INSISTED UPON A SETTLEMENT OF THE WHOLE THING. I AM CONFIDENT OF THAT. I YIELDED TO THAT." Again he testifies that he explained to Grumley the receipt evidencing this sweeping settlement, reducing it to a moral certainty that Grumley was apprised of its true character. All this evidence is dropped out of what is represented to be "all the material parts" of Broadhead's testimony. It would have been quite as accurate to have presented the part left out, and then held that up as being all that was material. It is not the number of words a witness uses

that renders his testimony important, but the number and character of the facts he discloses.

In the decision of this cause, a majority of the court deduced from the evidence the following propositions or conclusions of fact, to-wit:

"1. Col. Broadhead was the authorized and fully trusted representative of the plaintiff in his negotiations for a settlement. He was of the opinion, as he testifies, that Grumley would have settled for $3,000 had he advised it.

"2. In these negotiations Broadhead came to a clear and definite understanding with the counsel of the opposite party that the settlement should include both suits. That was *insisted* upon and he yielded to the demand.

"3. It therefore appears that the plaintiff's counsel, Col. Broadhead, knew that the settlement was understood to include the second as well as the first suit, and that it was understood by himself and the opposite party to be embraced in the receipt.

"4. Thus knowing and understanding the facts of the settlement, he expounded the receipt to his client. If the exposition was a fair one — and the contrary is not pretended — Grumley was thereby advised of the scope of the settlement and the import of the receipt as the same were understood by Broadhead and the opposite party. In a word, he was made to "know all about it," and Broadhead testifies, as we have seen, that he supposed at the time that such was the fact.

"5. This matter is not left to inference alone. Grumley's knowledge is shown affirmatively by the testimony of Judge Krum. I find it to be true, as testified by this witness, that Grumley was in the witness's office on the day of the settlement in company with Webb, and that he there recognized the settlement as including the subject-matter of both suits.

"6. Grumley's subsequent conduct accords with this view, and is inconsistent with the notion that he believed the second suit was left to be fought out in the courts. He gave it no attention thenceforward for nearly a year and a half, or at least not enough attention, according to his own swearing, to ascertain that it had

been dismissed, untill it had been out of court nearly eighteen months.

" 7. The settlement, assuming it to have embraced both suits, was still fair and reasonable. The evidence shows that the $6,500 paid by Webb was a full equivalent for the balance due on the rent account, and for the value of the houses sued for in the second suit."

It has been insisted that Broadhead's authority to negotiate, mentioned in the first proposition, was limited to the judgment, and an effort has been made to explain away the force of the facts recited in the sixth proposition. Otherwise than this, no definite and tangible objection has been taken to the soundness of any one of the propositions above recited. All else is indefinite, vague, uncertain — a violent general assault, without attacking anything specific except personal character.

The second, third and fourth propositions rest mainly upon the testimony of Col. Broadhead. That testimony is fully set out in the record, but not a word of it can be found in the recitals of evidence contained in the dissenting opinion.

The second, third, fourth and seventh propositions rest mainly upon new evidence — that is, evidence contained in the present record which was not in the first. Whether it requires any remarkable mental acumen to distinguish the one record from the other I do not care to discuss.

There occurs in my former opinion this statement: "It is an entire mistake to suppose that there is any serious conflict between Judge Krum and Col. Broadhead. They differ as to details, but they agree perfectly as to the substance of the settlement — that it was to include both suits." I desire to reiterate and re-affirm the entire accuracy of this statement. There is nothing in the evidence at variance with it.

The fifth proposition above recited rests mainly upon Judge Krum, and it is the only one of the seven propositions that depends upon his testimony in the *slightest degree*. On this issue the great struggle in the case has been TO BREAK DOWN JUDGE KRUM, so as to destroy the evidence on which this proposition rests. It is with that view that a desperate effort is made

to keep up the idea of an irreconcilable antagonism between him and Col. Broadhead. But Broadhead does not contradict the evidence on which the fifth proposition is based.

He was not present. and knew nothing, and did not claim to know anything, of the occurrences in Krum's office on the 7th of March, 1865, to which Krum testifies. The attempt to array Broadhead against Krum on *that point* is a total failure. Failing in that, the fifth proposition must stand. That being sustained, it would be of no avail to the plaintiff if the remaining six were decided in his favor.

I concur in overruling the motion.